**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

AMERICAN MANUFACTURERS OF
MULTILAYERED WOOD FLOORING,

<div align="center">Plaintiff,</div>

<div align="center">v.</div>

UNITED STATES,

<div align="center">Defendant,</div>

<div align="center">and</div>

JIANGSU SENMAO BAMBOO AND WOOD
INDUSTRY CO., LTD., *et. al*,

<div align="center">Defendant-Intervenors.</div>

Before: Hon. Richard K. Eaton,
Senior Judge

Court No. 20-03948

## <u>ORDER</u>

Upon consideration of the motion of the American Manufacturers of Multilayered Wood Flooring for judgement on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED,** that the American Manufacturers of Multilayered Wood Flooring's motion for judgement on the agency record is granted; and it is further

**ORDERED,** that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____
Hon. Richard K. Eaton, Senior Judge

Dated: _____, 2021
        New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,**<br><br><div align="center">**Plaintiff,**</div><br><div align="center">**v.**</div><br>**UNITED STATES,**<br><br><div align="center">**Defendant,**</div><br><div align="center">**and**</div><br>**JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD.,** *et. al*,<br><br><div align="right">**Defendant-Intervenors.**</div> |

**Before: Hon. Richard K. Eaton, Senior Judge**

**Court No. 20-03948**

<u>**THE AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING'S RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, the American Manufacturers of Multilayered Wood Flooring ("AMMWF") hereby moves for judgement upon the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on *Multilayered Wood Flooring from the People's Republic of China* for the period of December 1, 2017 through November 30, 2018. Issues and Decision Memorandum accompanying *Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 78,118 (Dep't Commerce Dec. 3, 2020) (final results of antidumping duty admin. rev. and new shipper rev. and final deter. of no shipments; 2017-2018), P.R. 468.

AMMWF respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that agency findings, conclusions, and/or determinations with respect to this decision are unexplained, not supported by substantial evidence, or otherwise not in

**Court No. 20-03948**

accordance with law. AMMWF further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to American Manufacturers of Multilayered Wood Flooring*

Dated: July 16, 2021

NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

AMERICAN MANUFACTURERS OF
MULTILAYERED WOOD FLOORING,

                Plaintiff,

    v.

UNITED STATES,

                Defendant,

    and

JIANGSU SENMAO BAMBOO AND WOOD
INDUSTRY CO., LTD., *et. al*,

                Defendant-Intervenors.

Before: Hon. Richard K. Eaton,
    Senior Judge

Court No. 20-03948

NON-CONFIDENTIAL VERSION

Business Proprietary Information
Removed from Pages 10 and 26.

THE AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING'S
MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGEMENT
ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to American Manufacturers of
Multilayered Wood Flooring*

Dated: July 16, 2021

Ct. No. 20-03948                                           NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    RULE 56.2 STATEMENT .................................................................. 1

    A.    Administrative Determination Under Review .......................................1

    B.    Issues Presented ........................................................................1

III.   STATEMENT OF FACTS ................................................................ 3

    A.    Background .................................................................................3

    B.    Surrogate Financial Ratios ...........................................................5

    C.    Surrogate Labor Rate ..................................................................7

    D.    Surrogate Value for Glue ...........................................................10

    E.    Calculation of the Margin for Separate Rate Companies .....................12

IV.   STANDARD OF REVIEW .............................................................. 13

V.    ARGUMENT ................................................................................ 14

    A.    Commerce's Allocation of Costs to Calculate the Surrogate Financial Ratios Was Not Supported by Substantial Evidence and Otherwise in Accordance with Law ..............................................14

    B.    Commerce's Assumption of 24 Working Days Per Month for Calculating the Surrogate Labor Rate Was Unsupported by Substantial Evidence and Not in Accordance with Law.........................19

    C.    Commerce's Valuation of the Glue Input Using HTS 3506.91.10 Was Unsupported by Substantial Evidence and Not in Accordance with Law ..............................................................................24

    D.    Commerce's Calculation of the Dumping Margin for Companies Eligible for the Separate Rate Was Unsupported by Substantial Evidence and Not in Accordance with Law .......................................28

VI.   CONCLUSION ............................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,*
    37 CIT 1116, 929 F. Supp. 2d 1352 (2013) ..............................................21

*Coal. of Am. Flange Producers v. United States,*
    448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ..........................................20

*Diamond Sawblades Mfrs.' Coal. v. United States,*
    No. 17-00167, slip. op. 18-146 (Ct. Int'l Trade Oct. 23, 2018).............21

*CS Wind Viet. Co. v. United States,*
    832 F.3d 1367 (Fed. Cir. 2016)..................................................14, 21

*Dongguan Sunrise Furniture Co. v. United States,*
    36 CIT 860, 865 F. Supp. 2d 1216 (2012) ...............................................16

*Downhole Pipe & Equip. LP v. United States,*
    36 CIT 1509, 887 F. Supp. 2d 1311 (2012) .............................................25

*Elkay Mfg. Co. v. United States,*
    34 F. Supp. 3d 1369 (Ct. Int'l Trade 2014) ..............................14, 15, 16

*Jiaxing Brother Fastener Co. v. United States,*
    380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ................................14, 15

*Jindal Poly Films Ltd. of India v. United States,*
    365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ..........................................20

*Jinko Solar Co. v. United States,*
    229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ...................................25, 27

*Magnesium Corp. of Am. v. United States,*
    20 CIT 1092, 938 F. Supp. 885 (1996) ....................................................17

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019)..................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...................................................................................13

*NMB Sing. Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009).........................................................14, 20

**Ct. No. 20-03948**                                                    NON-CONFIDENTIAL VERSION

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ...............................................................13

*U.S. Steel Corp. v. United States*,
    37 CIT 1799, 953 F. Supp. 2d 1332 (2013) ............................................13

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .......................................................................13

19 U.S.C. § 1677b(c)(1) .........................................................................24, 25

19 U.S.C. § 1677b(c)(1)(B) ....................................................................14, 22

**Regulations**

19 C.F.R. § 351.408(c)(4) ............................................................................14

**Administrative Materials**

*Antidumping Methodologies in Proceedings Involving Non-Market Economies:
    Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't
    Commerce June 21, 2011) ..........................................................................22

*Certain Stilbenic Optical Brightening Agents From the People's Republic of China*,
    77 Fed. Reg. 17,436 (Dep't Commerce Mar. 26, 2012) ..........................18

*Polyvinyl Alcohol from the People's Republic of China*,
    68 Fed. Reg. 47,538 (Dep't Commerce Aug. 11, 2003) ..........................17

*Porcelain-on-Steel Cooking Ware From China*,
    65 Fed. Reg. 31,144 (Dep't Commerce May 16, 2000) ...........................18

## I.        INTRODUCTION

On behalf of the American Manufacturers of Multilayered Wood Flooring ("AMMWF"),

we respectfully submit the following memorandum in support of AMMWF's Rule 56.2 motion for

judgement on the agency record in this action.

## II.       RULE 56.2 STATEMENT

### A.        Administrative Determination Under Review

This action challenges the determination by the Department of Commerce ("Commerce")

in the administrative review of the antidumping duty order on multilayered wood flooring from

the People's Republic of China for the period of December 1, 2017 through November 30, 2018.

*Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 78,118 (Dep't

Commerce Dec. 3, 2020) (final results of antidumping duty admin. rev. and new shipper rev. and

final deter. of no shipments; 2017-2018), P.R. 484 ("Final Deter."); and accompanying Issues and

Decision Memorandum, P.R. 468 ("IDM").[1]

### B.        Issues Presented

####       1.       Whether Commerce's calculation of the surrogate financial ratios was
####                supported by substantial evidence and otherwise in accordance with
####                law.

No. In its calculation of the surrogate financial ratios in the final determination, Commerce

failed to accurately allocate costs such that the resulting overhead expense is understated. While

Commerce's basis for doing so was to avoid potentially double counting indirect labor costs, the

agency pointed to nothing on the record to demonstrate that such double counting would in fact

---

[1]        Documents on the agency record are referred to within this brief by the number provided
in Commerce's administrative record index, filed with the Court on March 15, 2021, ECF No. 32.
Confidential documents are referred to with the rubric "C.R." followed by the relevant number;
public documents and public versions of confidential documents are referred to by the rubric
"P.R." followed by the relevant number.

occur and failed to address the fact that its approach would result in an understated overhead expense. Moreover, Commerce also failed to take into account information on the record that would have allowed it to avoid any potential double counting while also fully accounting for the overhead expense. As such, Commerce's calculation of the surrogate financial ratios was not supported by substantial evidence and otherwise in accordance with law.

> 2.    **Whether Commerce's calculation of the surrogate labor rate was supported by substantial evidence and otherwise in accordance with law.**

No. To calculate an hourly rate for the labor surrogate value, Commerce relied on the assumption that there are 24 working days per month and 8 working hours per day. In doing so, Commerce rejected information submitted by AMMWF indicating that the number of hours worked in 2018 was substantially lower and, accordingly, that the resulting hourly wage rate was understated. To justify relying on the assumption of 24 working days per month, Commerce stated that it was following its normal practice and that AMMWF's data were not specific to Romania or the underlying labor cost data. However, Commerce failed to acknowledge that its bases for rejecting AMMWF's proposed data apply equally to the data it used and to address AMMWF's analysis demonstrating that the agency's approach was unreasonable. In light of this information, Commerce's reliance on an assumption of 24 working days per month because that is its normal practice did not provide an adequate basis for the agency's determination.

> 3.    **Whether Commerce's calculation of the surrogate value for glue was supported by substantial evidence and otherwise in accordance with law.**

No. In its final determination, Commerce valued glue used by the respondents in the production of subject merchandise based on import data under a harmonized tariff scheduled ("HTS") subheading that covered certain glue described as of "a kind used solely or principally

for the manufacture of flat panel displays or touch-sensitive screen panels." In doing so, Commerce rejected AMMWF's argument that import data under a different HTS subheading was more appropriate based on AMMWF's failure to demonstrate that the HTS category used was wrong. However, as AMMWF argued, the HTS subheading itself indicates that it does not describe the input used by respondents and there is nothing on the record indicating that it does represent the input used. As Commerce failed to address this information, Commerce's selection of the glue surrogate value was not supported by substantial evidence and otherwise in accordance with law.

> **4.** **Whether Commerce's calculation of the dumping margin for the companies eligible for a separate rate was supported by substantial evidence and otherwise in accordance with law.**

No. Consistent with its normal practice, Commerce based the dumping margin for non-individually examined companies eligible for a separate rate on the margins calculated for the mandatory respondents. As Commerce erred in its calculation of the dumping margins for the mandatory respondents, the resulting separate rate calculated based on these margins is likewise flawed.

## III.   STATEMENT OF FACTS

### A.   Background

On January 17, 2020, Commerce published its notice of initiation of the administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China for the period of review ("POR") of December 1, 2017 through November 30, 2018. *See Multilayered Wood Flooring from the People's Republic of China*, 85 Fed. Reg. 6,911 (Dep't Commerce Feb. 6, 2020) (antidumping duty admin. rev. and new shipper rev., prelim. deter. of no shipments, and rescission of rev. in part; 2017-2018), P.R. 404 ("Prelim. FR"), and accompanying Preliminary Decision Memorandum at 2, P.R. 387 ("Prelim. Memo"). Commerce subsequently

selected two companies—the Fusong Jinlong Group ("Jinlong")[2] and Jiangsu Guyu International Trade Co., Ltd. ("Guyu")—as mandatory respondents. Prelim. Memo at 3. Commerce accordingly issued these companies initial, as well as supplemental, questionnaires. *Id.* As this administrative review covered a non-market economy ("NME") country, Commerce also solicited and received information from the parties regarding the selection of data to be used to value the respondents reported factors of production ("FOPs"). *Id.* at 3, 18. Additionally, during this time, Commerce received separate rate applications and separate rate certifications from various companies seeking to be deemed eligible for a separate rate. *Id.* at 2-3.

On January 31, 2020, Commerce issued its preliminary determination, calculating a dumping margin of 0% for Jinlong and Guyu. Prelim. FR at 6,913. Commerce also calculated a margin of 0% for the non-individually examined companies that were eligible for a separate rate, based on the weighted-average of the dumping margins calculated for the mandatory respondents. Prelim. Memo at 16-17. Following the issuance of the preliminary determination, parties submitted case and rebuttal briefs, and Commerce held a hearing. IDM at 1-3. Based on the arguments presented in the briefs, Commerce made certain modifications to its calculations for the dumping margins for Jinlong and Guyu. *Id.* at 6-20. Notwithstanding these modifications, in its final determination, Commerce continued to calculate a dumping margin of 0% for Jinlong and Guyu and, accordingly, for the separate rate companies. Final Deter. at 78,119. After the issuance of Commerce's final determination on November 20, 2020, AMMWF submitted ministerial error comments, outlining certain clerical errors contained in the final determination. *See* Memorandum from Irene Darzenta Tzafolias, Dir., Off. VIII, Antidumping and Countervailing Duty Operations,

---

[2]     As Commerce noted, Dalian Qianqiu Wooden Product Co., Ltd, Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., and Fusong Qianqiu Wooden Product Co., Ltd. were treated collectively as the "Fusong Jinlong Group." Prelim. Memo at 1 n.1.

to James Maeder, Deputy Ass't Sec'y for Antidumping and Countervailing Duty Operations, re: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Response to Allegation of Ministerial Errors in the Final Results* (Jan. 15, 2021) at 1, C.R. 374, P.R. 486. While Commerce made modifications to its calculations based on these comments, the revisions did not change the final dumping margins calculated. *Id.* Following the issuance of the final determination, AMMWF filed a summons and complaint with this Court, challenging certain aspects of Commerce's determination. The facts specific to the issues challenged by AMMWF are outlined below.

### B.     Surrogate Financial Ratios

Consistent with its normal practice in NME proceedings, Commerce solicited information from the parties regarding data to value the respondents' FOPs, including overhead, selling, general, and administrative ("SG&A") expenses, and profit. *See* Prelim. Memo at 28-30. In providing such information, AMMWF, Jinlong, and Guyu each proposed relying on the 2018 annual report for Romanian producer Sigstrat S.A. ("Sigstrat") for the surrogate financial ratios. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Initial Comments on Surrogate Values* (Aug. 23, 2019) at Exhibits 10A–10B, C.R. 237-243, P.R. 328-332 ("AMMWF Initial SV"); Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China— Preliminary Surrogate Value Submission* (Aug. 23, 2019) at Exhibit SV-3, P.R. 321-327 ("Jinlong Prelim. SV"); Letter from Clark Hill PLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Submission of Surrogate Values* (Aug. 23, 2019) at Exhibit SV-9, P.R. 317-320 ("Guyu SV Submission"). However, each party proposed a different approach for the calculation of the surrogate overhead, SG&A expenses, and profit ratios. AMMWF Initial

SV at Exhibits 10A–10B; Jinlong Prelim. SV at Exhibit SV-1; Guyu SV Submission at Exhibit

SV-8. In the preliminary determination, Commerce relied on the calculation of the surrogate

financial ratios as proposed by Jinlong but provided no discussion or explanation as to why this

calculation was used. Memorandum from Alexis Cherry and Sergio Balbontin, Int'l Trade

Compliance Analysts, Off. VII, Enf't and Compliance, to The File, re: *Antidumping Duty*

*Administrative Review and New Shipper Review of Multilayered Wood Flooring from the People's*

*Republic of China; 2017-2018: Surrogate Values for the Preliminary Results* (Jan. 31, 2020) at 7,

P.R. 392 ("Prelim. SV Memo"); Prelim. Memo at 32. This resulted in Commerce using ratios of

5.80%, 5.89%, and 1.22% for the overhead, SG&A expenses, and profit surrogate values,

respectively. Prelim. SV Memo at 7.

In its case brief, AMMWF argued that Commerce should adjust its calculation of the

surrogate financial ratios to better reflect the information contained in Sigstrat's financial

statement. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from*

*the People's Republic of China: Case Brief* (July 8, 2020) at 3-5, C.R. 351, P.R. 444 ("AMMWF

Case Br."). Specifically, AMMWF explained that a comparison of Commerce's worksheet for the

financial ratios with Sigstrat's financial statement demonstrated that certain expenses were not

properly allocated, resulting in distorted financial ratios. *Id.* Most notably, AMMWF highlighted

that Sigstrat's financial statement showed that: (1) the cost of goods sold totaled RON 30,703,287,

but Commerce allocated RON 34,464,210 to materials, labor, energy, and overhead (*i.e.*, cost of

goods sold), (2) "General administrative expenses" totaled RON 4,383,473, but Commerce

allocated only RON 1,988,352 to SG&A expenses, and (3) "Indirect production expenses" totaled

RON 8,512,590, but Commerce allocated only RON 1,890,198 to overhead expenses. *Id.* at 5.

Accordingly, AMMWF requested that Commerce modify its financial ratio calculation such that

the resulting ratios would better reflect the way in which costs are allocated in Sigstrat's financial statement. *Id.* at 4-5. AMMWF also provided a worksheet demonstrating such a calculation. *Id.* at 5 and Exhibit 1.

In its final determination, Commerce agreed that it was necessary to modify its calculation of the financial ratios. IDM at 8. In doing so, Commerce stated that it agreed that its calculation "should incorporate certain additional information from the notes . . . " and, consequently, made certain adjustments to the cost of goods sold, overhead, and SG&A expenses. *Id.* However, Commerce did not fully rely on the calculation proposed by AMMWF, stating that it "may also be distortive, as we do not know the components of the {overhead} figure which may include indirect labor expenses, thus potentially overstating {overhead}." *Id.* Commerce's revised calculation resulted in ratios of 12.68%, 19.53%, and 1.29% for the overhead, SG&A expenses, and profit surrogate values, respectively. *Id.*

### C.   <u>Surrogate Labor Rate</u>

In providing information for the purpose of valuing Jinlong's and Guyu's labor FOPs, AMMWF submitted data obtained from *Trading Economics* with respect to Romanian average gross monthly wages. AMMWF Initial SV at Exhibit 5B. As the data obtained was for monthly wages, AMMWF provided a calculation of an hourly labor cost based on an assumption of 1,734 average working hours per year. *Id.* at Exhibit 5A. The working hours per year assumption was based on data obtained from the Organization for Economic Cooperation and Development ("OECD") regarding the "Average annual hours actually worked per worker" in 2018 for "OECD countries." *Id.* at Exhibit 5C. In their surrogate value submissions, Jinlong provided data from the Institutul National de Statistica ("INSSE") regarding Romania's "Monthly average net earnings in the economy on section and division level" for the manufacture of wood and of products of wood,

while Guyu submitted data from *Trading Economics* regarding Romanian "Average Monthly Gross Wages in Manufacturing." Jinlong Prelim. SV at Exhibit SV-5; Guyu SV Submission at Exhibit SV-3. Both Jinlong and Guyu calculated an hourly labor cost based on the assumption of 24 working days per month and 8 working hours per day; neither company provided any documentation or explanation regarding this assumption. Jinlong Prelim. SV at Exhibit SV-5; Guyu SV Submission at Exhibit SV-3.

In the preliminary determination, Commerce relied on the data provided by Jinlong from the INSSE, explaining that these data "are the best available information for valuing labor because the data are contemporaneous with the POR, industry-specific, and reflect all costs related to labor, including wages, benefits, housing, and training." Prelim. Memo at 31; Prelim. SV Memo at 6. In doing so, Commerce relied on an assumption of 24 working days per month and 8 working hours per day to calculate an hourly labor cost but provided no discussion of this calculation. *See* Prelim. SV Memo at 6; Memorandum from Alexis Cherry, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VII, to The File, re: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Preliminary Results Margin Calculation for Jiangsu Guyu International Trading Co., Ltd.* (Jan. 31, 2020) at Attachment VI, sheet "Labor", C.R. 323-324, P.R. 388 ("Guyu Prelim. Analysis Memo").

In its case brief, AMMWF made two arguments regarding Commerce's calculation of the surrogate labor rate. AMMWF Case Br. at 5-8. First, AMMWF argued that Commerce should rely on the data from *Trading Economics* because, while less specific than the INSSE data, it better reflected the full cost of labor. *Id.* at 5-7. Second, AMMWF argued that, if Commerce continued to rely on the INSSE data, it should derive an hourly wage rate based on the working hours data obtained from the OECD instead of the assumption of 24 working days per month. *Id.* at 7-8.

Specifically, AMMWF highlighted that these data showed that, in 2018, the actual average hours worked in the OECD countries totaled 1,734; in contrast, Commerce's assumption resulted in 2,304 working hours per year, an amount significantly greater than what was reported for any of the countries listed in the OECD data. *Id.* at 7. In addition, AMMWF explained that there are only approximately 22 Monday through Friday working days in any given month and that, if a modest number of holidays, vacation days, and sick days are taken into account, there are approximately only 19 working days per month. As such, AMMWF argued that Commerce's assumption of 24 working days per month was not reasonable, as it overstates the number of working hours in a month, and that, instead, Commerce should rely on the OECD data to convert monthly wage rate data to an hourly wage rate. *Id.* at 7-8.

In its final determination, Commerce rejected both of these arguments. Commerce first stated that it disagreed that the *Trading Economics* data should be used as the labor surrogate value given the greater specificity of the INSSE data. IDM at 12. Second, Commerce declined to recalculate the hourly labor cost, pointing to the statement in its *Labor Methodologies* notice that, when hourly data is not available, it will calculate an hourly labor rate based on the assumption of "8 working hours per day, 5.5 working days a week, and 24 working days per month". *Id.* at 13 (citing *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 n.11 (Dep't Commerce June 21, 2011) ("*Labor Methodologies*")). Commerce further stated:

> To use the OECD data suggested by the petitioner would employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor. Furthermore, the petitioner has not demonstrated that the labor rate reported by *Trading Economics* does not account for vacation days, sick days, or holidays, or that workers are not paid for such days.

*Id.* Accordingly, Commerce did not modify its labor rate calculation. *Id.*

**Business Proprietary Information Has Been Deleted**

### D.    Surrogate Value for Glue

In responding to the Section D questionnaire, both respondents provided a list of the inputs used in the production of subject merchandise, including glue. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Sections C & D Questionnaire Response* (July 16, 2019) at Exhibit D-7, C.R. 185-216, P.R. 278 ("Jinlong Sec. CD QR"); Letter from Clark Hill PLC to Sec'y Commerce, re: *Responses to Sections C and D of the Questionnaire: Multilayered Wood Flooring from the People's Republic of China* (July 10, 2019) at Exhibit D-1-1, C.R. 165-83, P.R. 273-275 ("Guyu Sec. CD QR").[3] In doing so, Jinlong [                                                              ], while Guyu described its input as [                                                      ]. Jinlong Sec. CD QR at Exhibit D-6-D-7; Guyu Sec. CD QR at Exhibit D-1-1. In their surrogate value submissions, respondents and AMMWF agreed that HTS subheading 3506.91 was the appropriate six-digit HTS category under which respondents' glue input should be valued. However, while AMMWF and Jinlong provided information with respect to HTS 3506.91 generally, Guyu presented data specific to HTS 3506.91.10. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Submission of Additional Surrogate Values* (Jan. 2, 2020) at Exhibit 1, P.R. 374-375 ("AMMWF Add'l SV"); Jinlong Prelim. SV at Exhibit SV-1; Guyu SV Submission at Exhibit SV-1. In its preliminary determination, without explanation, Commerce valued Jinlong's and Guyu's glue input using data under HTS 3506.91.10. Prelim. SV Memo at 3-4.

---

[3]    AMMWF notes that Jinlong reported using "Glue," "Glue Powder," and "Glue 502," while Guyu reported using "[                    ]." Jinlong Sec. CD QR at Exhibit D-7; Guyu Sec. CD QR at Exhibit D-1-1. The argument contained herein relates to Jinlong's input described as "glue" and Guyu's input described as "[                    ]." For ease of reference, AMMWF refers to these inputs herein as the respondents' glue inputs.

In its case brief, AMMWF argued that the glue input surrogate value should be modified for the final determination. Specifically, AMMWF highlighted that HTS 3506.91.10 covers "Adhesives based on polymers of headings 3901 to 3913 or on rubber: Optically clear free-film adhesives and optically clear curable liquid adhesives of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels." AMMWF Case Br. at 9 (citations omitted). AMMWF explained that, given this description, there was no basis to believe that the glue inputs used by the respondents was properly reflected under this HTS subheading. *Id.* at 9-10. Instead, AMMWF argued that the glue inputs should be valued under HTS 3506.91.90, which covered "Adhesives based on polymers of headings 3901 to 3913 or on rubber: Other," as this better represented the input used.[4] *Id.* (citations omitted). AMMWF argued in the alternative that the glue input should be valued using data for HTS 3506.91. *Id.* at 10. No party addressed this argument in the rebuttal briefs. *See* IDM at 14-15.

In its final determination, Commerce rejected this argument. *Id.* In doing so, Commerce stated in full:

> We disagree with the petitioner. The petitioner does not cite record evidence, such as information about the glue used by Jinlong or Guyu or industry standards with respect to this input, to support its contention that HS number 3506.91.10 does not represent a reasonable SV for glue for both respondents. Jinlong reported HS number 3506.91 but did not describe the glue it used in the production of the subject merchandise, while Guyu reported the more specific HS number 3506.91.10, corresponding with its description of the glue it used. We preliminarily determined to use the more specific HS number for both companies based on the production processes reported by Guyu and Jinlong. Therefore, for the final results, we continue to use HS number 3506.91.10 to value glue for Jinlong and Guyu.

---

[4]     AMMWF notes that, while it initially proposed that data under HTS 3506.10 be used to value respondents' glue input, the import data it submitted provided data at the eight-digit level, meaning that data specific to HTS 3506.91.90 are on the record. AMMWF Add'l SV at Exhibit 2.

*Id.* at 15 (footnote omitted). Neither the final surrogate value memorandum nor any other aspect of Commerce's final determination provided any further discussion of this issue. *See* Memorandum from Alexis Cherry and Sergio Balbontin, Int'l Trade Compliance Analysts, Off. VIII, Enf't and Compliance, to The File: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Surrogate Values for the Final Results* (Nov. 20, 2020) at 1-2, P.R.475-476 ("Final SV Memo"); Memorandum from Sergio Balbontin, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VII, to The File, re: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Final Results Margin Calculations for Dalian Qianqiu Wooden Product Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., and Fusong Qianqiu Wooden Products Co., Ltd.* (Nov. 20, 2020) at 1-6, C.R. 354-365, P.R. 469-473; Memorandum from Alexis Cherry, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII, to The File, re: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Final Results Margin Calculations for Jiangsu Guyu International Trading Co., Ltd.* (Nov. 20, 2020) at 1-3, C.R. 367-372, P.R. 477-481.

### E.  Calculation of the Margin for Separate Rate Companies

Consistent with its normal methodology in NME cases, Commerce provided respondents with an opportunity to demonstrate their independence from the Government of China such that they would be eligible for a so-called separate rate. *See* Prelim. Memo at 11-12. During the course of the investigation, numerous companies submitted information regarding their eligibility for the separate rate, and Commerce ultimately determined that 54 companies that were not individually reviewed had made a sufficient demonstration of independence from the Government. *See id.* at

12 and Appendix; Final Deter. at 78,121. Consistent with its normal methodology, Commerce

calculated the dumping margin for these companies based on the weighted-average dumping

margin of zero calculated for both mandatory respondents. IDM at 27.

## IV.   **STANDARD OF REVIEW**

The U.S. Court of International Trade reviews decisions by Commerce in antidumping duty

proceedings to determine whether those decisions are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir.

2002) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). A

determination as to whether substantial evidence exists must be based on the record as a whole,

taking into consideration both supportive evidence "as well as evidence that 'fairly detracts from

the substantiality of the evidence.'" *Id.* (quoting *Alt. Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984)).

Moreover, "{t}o be in accordance with law, a decision must not be arbitrary and

capricious . . . and must be supported by substantial evidence and reasoned explanations." *U.S.*

*Steel Corp. v. United States*, 37 CIT 1799, 1801-02, 953 F. Supp. 2d 1332, 1336 (2013) (citing

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43

(1983); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011)). To meet the

"arbitrary and capricious" standard, Commerce must have "examine{d} the relevant data and

articulate{d} a satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines,*

*Inc. v. United States*, 371 U.S. 156, 168 (1962)). "A determination is also arbitrary and capricious

if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1356 (Ct. Int'l Trade 2019) (quoting *State Farm*, 463 U.S. at 43). While Commerce's explanations do not need to be perfect, "the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *State Farm*, 463 U.S. at 43); *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (remanding to Commerce because the agency did not provide "the needed explanation setting forth the interpretations and evidence-based factual findings that establish the required connection from statute to determination.").

## V.   ARGUMENT

### A.   Commerce's Allocation of Costs to Calculate the Surrogate Financial Ratios Was Not Supported by Substantial Evidence and Otherwise in Accordance with Law

As part of its NME methodology, Commerce is directed to identify values to serve as a surrogate for overhead, SG&A expenses, and profit in the calculating normal value. 19 U.S.C. § 1677b(c)(1)(B); *see* 19 C.F.R. § 351.408(c)(4). Commerce typically accounts for these so-called surrogate financial ratios by relying on information contained in the financial statements of producers of identical or comparable merchandise in a surrogate country. *See, e.g.*, *Jiaxing Brother Fastener*, 380 F. Supp. 3d at 1359-61; 19 C.F.R. § 351.408(c)(4). In doing so, as with all other aspects of Commerce's surrogate value methodology, the agency is instructed to rely on the best available information. 19 U.S.C. § 1677b(c)(1)(B). This means that Commerce must provide an adequate explanation of and support for both the data source on which it relies as well as the way in which it calculates the costs to be used in the calculation of normal value. *See Elkay Mfg. Co.*

*v. United States*, 34 F. Supp. 3d 1369, 1382 (Ct. Int'l Trade 2014) ("The record lacks substantial evidence to support the Department's conclusion that the rate Commerce applied to the hours of production labor reported by the investigated respondents overstated the value of those labor hours to such an extent as to justify the specific, compensatory adjustments that Commerce made to the SG & A/interest expense ratios."); *Jiaxing Brother Fastener*, 380 F. Supp. 3d at 1360-61 (finding that Commerce's explanation of why it did not adjust its financial ratio calculation to avoid double counting was not supported by substantial evidence). Moreover, while Commerce "has discretion in determining the best method of constructing normal value . . ., it must exercise its discretion consistently with the purpose of the antidumping statute, that is, to 'determine margins as accurately as possible.'" *Elkay Mfg.*, 34 F. Supp. 3d at 1375-76 (quoting *Lakso Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (internal quotations omitted)).

Here, Commerce has failed to calculate surrogate financial ratios in a manner consistent with the record such that the resulting financial ratios are distorted and do not constitute the best available information. As such, its calculation of the surrogate financial ratios is not supported by substantial evidence and otherwise in accordance with law. Specifically, in its financial ratio calculation in the final determination, Commerce allocated only RON 3,466,553 to overhead expenses despite the fact that Sigstrat's financial statement explicitly states that its "Indirect production expenses" or "Production overheads" totaled RON 8,512,590. AMMWF Initial SV at Exhibits 10A–10B. Commerce's sole identified basis for doing so is the concern that Sigstrat's overhead expenses could include indirect labor expenses, "thus potentially overstating {overhead}." IDM at 8. The record, however, demonstrates that, by taking this approach, Commerce has understated overhead.

Commerce's determination hinges on its finding that Sigstrat's reported line item for indirect production expenses "*may* include indirect labor expenses" and thus could "*potentially* overstat{e} {overhead}."[5] *Id.* (emphasis added). Commerce does not point to anything on the record demonstrating that this line item does include indirect labor. *Id.* Indeed, Commerce states that it "do{es} not know the components of the {overhead} figure . . . ." *Id.* Commerce's reliance on a lack of information regarding what is included in this line item is not sufficient to demonstrate that its concern regarding double counting renders its approach reasonable and supported. *Cf. Dongguan Sunrise Furniture Co. v. United States*, 36 CIT 860, 887-88, 865 F. Supp. 2d 1216, 1243-44 (2012) (rejecting an argument that Commerce's surrogate financial ratio calculation resulted in double counting because "the financial statements do not explain in sufficient detail what is included in each line item, and thus, cannot establish that the listed items are included").

Notably, this Court has recognized that Commerce may not rely on speculation about double counting concerns to justify an adjustment to the financial ratio calculation. In *Elkay Manufacturing Co. v. United States*, the Court considered Commerce's calculation of the financial ratios where it has excluded identified labor costs from SG&A expenses to avoid double counting. 34 F. Supp. 3d at 1379. Upon examination of the record, the Court found "the record lack{ed} substantial evidence to support the Department's conclusion that 'double-counting' of SG&A labor expenses required the specific downward adjustments to the SG&A/interest expense ratios that Commerce found necessary when calculating the normal value . . . ." *Id.* at 1380. In doing so, the Court highlighted that Commerce's justification for its adjustment "was too much a matter of

---

[5]     In its proposed calculation of the surrogate financial ratios, AMMWF proposed that manufacturing expenses be valued entirely based on the amount reported in the line item "Indirect production expenses" in Sigstrat's financial statement. AMMWF Case Br. at Exhibit 1. As such, Commerce's references to the overhead amount identified by AMMWF appear to relate to this line item. *See* IDM at 8.

speculation" and could not support the extent of the adjustment made. *Id.* at 1382. Here, too, Commerce's reliance on speculation regarding the double counting of costs was not a sufficient basis for excluding amounts identified as indirect expenses in Sigstrat's financial statement from overhead in its financial ratio calculation.

The arbitrariness of Commerce's approach is underscored by the other evidence on the record indicating that Commerce's calculation does in fact understate the overhead expense. As Commerce has recognized, "{u}nder normal accounting practices, direct materials are classified as raw materials whereas indirect materials are treated as part of factory overhead." Issues and Decision Memorandum accompanying *Polyvinyl Alcohol from the People's Republic of China*, 68 Fed. Reg. 47,538 (Dep't Commerce Aug. 11, 2003) (notice of final deter. of sales at less than fair value) at 24; *see Magnesium Corp. of Am. v. United States*, 20 CIT 1092, 1102, 938 F. Supp. 885, 896 (1996) ("Factory overhead represents indirect manufacturing costs that a company incurs."). While it is true that indirect labor expenses can be included in overhead, overhead encompass a variety of expenses, such as depreciation, insurance, taxes, repairs and maintenance, and manufacturing supplies. *Magnesium Corp.*, 20 CIT at 1102, 938 F. Supp. at 896. Under Commerce's calculation, only three items, totaling RON 3,466,553, have been treated as overhead: depreciation, other materials, and third-party services. Final SV Memo at Attachment. As a result, only 41% of Sigstrat's identified overhead expenses have actually been included as overhead by Commerce (*i.e.*, 3,466,553 / 8,512,590). AMMWF Initial SV at Exhibits 10A–10B; Final SV Memo at Attachment. Given the numerous items that are typically encompassed by overhead expenses and the limited types of expenses treated as overhead in Commerce's calculation, it is not reasonable to presume that the remaining 59% of Sigstrat's reported overhead expenses exclusively, or even largely, covers indirect labor expenses. Instead, the most reasonable

assumption is that the remaining overhead expenses at least partially cover other types of expenses. Thus, by treating this amount of Sigstrat's overhead expenses as part of materials, labor, and energy as opposed to overhead, the overhead expense has been understated.

Moreover, to the extent that Commerce was concerned that overhead could be overstated if Sigstrat's overhead expenses included indirect labor expenses, the agency was able to make other, less distortive adjustments to account for this. In particular, in cases in which FOPs have been reported for a cost element that may also be captured by and cannot be removed from the overhead expense ratio, Commerce has removed the reported FOPs for such an expense from the normal value calculation. *See, e.g.*, Issues and Decision Memorandum accompanying *Porcelain-on-Steel Cooking Ware From China*, 65 Fed. Reg. 31,144 (Dep't Commerce May 16, 2000) (final results of antidumping duty admin. rev.) at cmt. 3 (explaining that, because indirect labor was included in the overhead expense, it should be otherwise removed from the normal value calculation to avoid double counting); Issues and Decision Memorandum accompanying *Certain Stilbenic Optical Brightening Agents From the People's Republic of China*, 77 Fed. Reg. 17,436 (Dep't Commerce Mar. 26, 2012) (final deter. of sales at less than fair value) at 9 ("Because the overhead cost includes PTT's energy costs, the Department then excluded the individual energy factors reported by the respondents from the normal value calculations in order to avoid double counting energy costs."). As both Jinlong and Guyu reported FOPs for indirect labor separately from direct labor, Commerce could have excluded these reported FOPs from the normal value calculation. Guyu Sec. CD QR at Sec. D, pp. 13-14; Jinlong Sec. CD QR at D-12 – D-13. This approach would have avoided any potential double counting, would have ensured that all overhead expenses were accounted for, and would have been consistent with the agency's practice in similar situations.

In short, given the record of this proceeding, Commerce has failed to adequately support its calculation of the surrogate financial ratios for manufacturing expenses. Commerce's calculation is based on its concern regarding the potential for double counting, but in taking this approach, the agency understates overhead expenses. Further, Commerce pointed to no information on the record demonstrating that double counting would occur if AMMWF's proposed calculation was used, and the record allowed the agency to avoid any potential double counting while also fully accounting for manufacturing expenses. As Commerce failed to address or otherwise take these issues into account, its final determination regarding the calculation of the surrogate financial ratios was not supported by substantial evidence or otherwise in accordance with law.

**B.**     **Commerce's Assumption of 24 Working Days Per Month for Calculating the Surrogate Labor Rate Was Unsupported by Substantial Evidence and Not in Accordance with Law**

In calculating the surrogate labor rate, Commerce converted the reported average monthly wage rate to an hourly wage rate using an assumption of 24 working days per month and 8 working hours per day (*i.e.*, 192 working hours per month or 2,304 working hours per year). *See* Guyu Prelim. Analysis Memo at Attachment VI. According to Commerce, this was done "in accordance with {its} practice" as identified in its *Labor Methodologies* notice. IDM at 13. In doing so, Commerce dismissed AMMWF's argument that this assumption overstated the number of working hours in a month and thus understated labor costs. AMMWF Case Br. at 7-8. In particular, AMMWF provided data showing that the average annual working hours for OECD countries in 2018 was 1,734 and presented an analysis demonstrating the unreasonableness of the agency's assumption of 24 working days per month. *Id.* As Commerce failed to adequately address these arguments and to sufficiently explain its determination in light of the record as a whole, its

calculation of the surrogate labor rate based on an assumption of 24 working days per month is not supported by substantial evidence and otherwise in accordance with law.

As has long been recognized, Commerce must explain the basis for its determinations and, while such explanations need not be perfect, the agency's "decision must be reasonably discernible to a reviewing court." *NMB Sing.*, 557 F.3d at 1319 (citing *State Farm*, 463 U.S. at 43). Moreover, "Commerce is obligated to respond to those arguments made by interested parties that bear on issues material to Commerce's determination." *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351-52 (Ct. Int'l Trade 2020) (citing *Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016)) (finding that Commerce failed to provide an adequate explanation where it "did not address several issues raised by Coalition that were material to the agency's determination{.}"). Accordingly, to provide an adequate explanation for a determination, Commerce must provide more than conclusory statements. *See Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1384-85 (Ct. Int'l Trade 2019) (finding that Commerce failed to provide a reasoned explanation where its "entire analysis for denying the two post-sale price adjustments is comprised of conclusory statements that the adjustments did not satisfy" certain criteria).

Commerce has failed to meet this burden here. In arguing that Commerce should adjust its calculation, AMMWF pointed to information on the record regarding the average annual hours actually worked per worker in OECD countries in 2018. AMMWF Case Br. at 7-8; AMMWF Initial SV at Exhibit 5C. AMMWF also provided an analysis of the number of working days per year to demonstrate that data on OECD countries was reasonable and that the assumption relied on by Commerce was unreasonable. AMMWF Case Br. at 7-8. In rejecting this argument, Commerce largely relied on two factors: (1) its normal practice, as outlined in its *Labor*

*Methodologies* notice and (2) the fact that using the OECD data "would employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor." IDM at 13. Neither of these points provide a reasoned basis for following the methodology used in the final determination or for rejecting AMMWF's data.

First, the fact that Commerce followed its normal methodology here does not adequately support its approach. As the Court of Appeals for the Federal Circuit has explained, "an agency's statement of what it 'normally' does or has done before . . . is not, by itself, an explanation of 'why its methodology comports with the statute.'" *CS Wind Viet.*, 832 F.3d at 1377 (quoting *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001)); *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544 (Fed. Cir. 2019) (in explaining why Commerce's reasoning was insufficient, highlighting that a declaration regarding what the agency normally does or has done before is not an adequate explanation) (citing *CS Wind Viet.*, 832 F.3d at 1377). For example, this Court has repeatedly found that Commerce fails to adequately explain its rejection of surrogate value data from a non-primary surrogate country where the determination is based only on the agency's preference for valuing data from a single primary surrogate country. *See, e.g.*, *Diamond Sawblades Mfrs.' Coal. v. United States*, No. 17-00167, slip. op. 18-146, at 25 (Ct. Int'l Trade Oct. 23, 2018) ("The regulatory preference for valuing inputs for an NME respondent's production using data from a single 'primary' surrogate country has been held insufficient to explain decisions to reject data from a non-primary surrogate country if questions remain unanswered as to the suitability of the primary surrogate country data."); *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 37 CIT 1116, 1120, 929 F. Supp. 2d 1352, 1355 (2013) ("{I}t is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available

information for a particular FOP"). Thus, relying on 24 working days per month to calculate the surrogate labor rate solely because that is the agency's normal practice does not constitute a sufficient explanation of the agency's determination here and fails to demonstrate that Commerce relied upon the best available information to value the labor surrogate value based on the record before it as required by the statute. *See* 19 U.S.C. § 1677b(c)(1)(B).

Second, Commerce faulted AMMWF's proposed data as requiring the agency to "employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor." IDM at 13. However, this is also true of the data upon which Commerce relied. Specifically, as Commerce noted, the assumption of 24 working days per month is stated in its *Labor Methodologies* notice. IDM at 13. In this notice, which is from 2011, Commerce explained that its preference for valuing labor in NME countries was to use data from the International Labor Organization Yearbook. *Labor Methodologies*, 76 Fed. Reg. 36,092. In describing its calculation methodology in this notice, Commerce noted, without further discussion that, "{w}here data is not available on a per-hour basis, the Department converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month." *Id.* at 36,094 n.11. In its final determination here, Commerce pointed to nothing on the record to demonstrate or explain why this assumption holds true with respect to the labor rate data it used. In other words, there is nothing on the record to suggest that the assumption Commerce relied on is specific to Romania, is from a primary source, or relates to the source used to value labor. Thus, the shortcomings upon which Commerce relied for rejecting AMMWF's proposal apply equally to the assumption the agency used. As such, these apparent deficiencies cannot provide a reasoned basis for Commerce rejecting the OECD data in favor of

its own methodology. This is particularly true given that the data underlying AMMWF's proposal is on the record, is specific to 2018, and is specific to OECD countries.

Furthermore, in this final determination, Commerce failed to properly address AMMWF's argument regarding the unreasonableness of its 24 working days per month assumption. Specifically, AMMWF demonstrated that there are approximately 22 Monday through Friday working days per month. AMMWF Case Br. at 7-8. If a reasonable number of additional non-working days, such as holidays, vacations, and sick days, are taken into account, then there are even fewer working days per month. *Id.* Accordingly, this analysis further supports the record information indicating that the assumption of 24 working days per month overstates the total number of working hours in a month and, consequently, results in an understated surrogate hourly labor rate. *Id.* Commerce's only discussion of this argument was to state that AMMWF "has not demonstrated that the labor rate reported by *Trading Economics* does not account for vacation days, sick days, or holidays, or that workers are not paid for such days." IDM at 13.

This misunderstands AMMWF's argument. AMMWF did not argue that *Trading Economics* does not account for days off or that workers are not paid for those days. Indeed, this argument did not relate to the use of the *Trading Economics* data and instead was raised to address the labor rate calculation if Commerce continued to use the INSSE data. AMMWF Case Br. at 7. Instead, AMMWF's argument was that the most reasonable presumption is that workers do receive additional time off and that Commerce's assumption does not account for this. As AMMWF highlighted in its case brief, accounting for even a modest number of days off results in approximately 19 working days per month, notably above the number used in Commerce's calculation. *Id.* at 8. Accordingly, Commerce's approach resulted in an understated labor cost because it treats potential days off (*i.e.*, days not worked) as days worked in determining the

number of hours worked to serve as the denominator in its calculation. In other words, Commerce's

calculation presumed that employees worked 5.5 days a week, every week, for the entire year. Not

only is this a questionable assumption on its face, but it is also inconsistent with the only

information on the record providing any indication of the number of hours worked in 2018. This

is the error identified by AMMWF with respect to the assumption of 24 working days per month.

As Commerce failed to address this argument or the evidence provided, it has failed address an

issue material to its determination. Consequently, Commerce has not adequately explained its

determination.

### C.   Commerce's Valuation of the Glue Input Using HTS 3506.91.10 Was Unsupported by Substantial Evidence and Not in Accordance with Law

To value Jinlong's and Guyu's glue input, Commerce relied on data for HTS 3506.91.10,

which covers "Adhesives based on polymers of headings 3901 to 3913 or on rubber: Optically

clear free-film adhesives and optically clear curable liquid adhesives of a kind used solely or

principally for the manufacture of flat panel displays or touch-sensitive screen panels." *See* IDM

at 14-15; AMMWF Initial SV at Exhibit 3. According to Commerce, the agency relied upon these

data because it "preliminarily determined to use the more specific HS number for both companies

based on the production process reported by Guyu and Jinlong. Therefore, for the final results,

{Commerce} continue{d} to use HS number 3506.91.10 to value glue for Jinlong and Guyu."

IDM at 15. However, in doing so, Commerce failed to identify any record information supporting

its determination, to take record information undermining this conclusion into consideration, and

to fully considered AMMWF's argument against using such data. Accordingly, Commerce's

conclusion was not supported by substantial evidence and otherwise in accordance with law.

As discussed above, the statute directs that, in selecting data to calculate normal value in

an NME proceeding, Commerce is instructed to use the "best available information." 19 U.S.C.

§ 1677b(c)(1). While Commerce does have discretion in selecting surrogate values, that discretion is not unbounded, and the agency must provide a sufficient explanation of why it exercised its discretion in a particular manner. *See Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333, 1355 (Ct. Int'l Trade 2017). Accordingly, where Commerce fails to adequately address evidence on the record or explain how its decision is reasonable in light of the record as a whole, its surrogate value selection cannot be considered supported by the record or otherwise in accordance with law. *See id.* (remanding for Commerce to further consider a surrogate value selection where the agency did not sufficiently address contrary evidence); *Downhole Pipe & Equip. LP v. United States*, 36 CIT 1509, 1523, 887 F. Supp. 2d 1311, 1325 (2012) (stating that Commerce's "failure here to explain evidence apparently contrary to a finding central to its determination leaves the court without the means necessary to affirm it as supported by the record").

Here, Commerce has not only failed to use the best available information to value the respondents' glue input but has also failed to provide a reasoned and supportable basis for its surrogate value selection. A review of Commerce's final determination shows that the agency provided no explanation as to why data for HTS 3506.91.10 constitutes the best, or even reasonable, information for valuing Jinlong's and Guyu's glue inputs, particularly in light of the record. *See* Prelim. SV Memo at 2-4; IDM at 14-15. Instead, the only basis Commerce provided in support of its selection was to state that it was rejecting AMMWF's proposal of using data under HTS 3506.91.90 (or, in the alternative, HTS 3506.91). IDM at 14-15. In particular, in rejecting AMMWF's argument that the glue surrogate be revised for the final determination, Commerce faulted AMMWF for not "cit{ing} record evidence, such as information about the glue used by Jinlong or Guyu or industry standards with respect to this input, to support its contention that HS

**Business Proprietary Information Has Been Deleted**

number 3506.91.10 does not represent a reasonable SV for glue for both respondents." *Id.* at 15. This reasoning, however, ignores the record.

As an initial matter, while Commerce focused on the supposed lack of information supporting AMMWF's argument, it failed to acknowledge that that neither Guyu nor Jinlong provided any information demonstrating that HTS 3506.91.10 does represent the type of glue used to produce subject merchandise. Indeed, Jinlong provided no description of the glue it uses and did not even suggest that HTS 3506.91.10 was the proper HTS category for describing its input, and Guyu provided no information regarding its glue input other than to state that [

]. *See id.*; Guyu Sec. CD QR at Exhibit D-1-1. In other words, Commerce has provided no explanation or pointed to any record evidence demonstrating that data for HTS 3506.91.10 reasonably represent the input at issue or are necessarily preferable given that there is nothing on the record indicating that this HTS category properly describes the respondents' glue input.

Moreover, contrary to Commerce's findings, AMMWF did point to evidence on the record suggesting that HTS 3506.91.10 does not represent the glue used by respondents. Specifically, as AMMWF highlighted in its case brief, HTS 3506.91.10 covers "Adhesives based on polymers of headings 3901 to 3913 or on rubber: Optically clear free-film adhesives and optically clear curable liquid adhesives of a kind *used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels*." AMMWF Initial SV at Exhibit 3 (emphasis added); AMMWF Case Br. at 9 (emphasis added). Given this description, there is no reason to believe that this is the same type of glue used in the manufacture of multilayered wood flooring. To the contrary, common sense would dictate that the manufacture of wood flooring *does not* use the same type of glue that is used *solely or principally* for the manufacture of flat panel displays or touch-sensitive screen

panels. In other words, the only information on the record regarding the propriety of the HTS category used is the HTS description itself, and, on its face, this information does not support Commerce's surrogate value selection.

In making its determination, however, Commerce did not address this information in any manner. IDM at 15. Instead, Commerce summarily dismissed AMMWF's argument because it did not provide additional evidence demonstrating that HTS 3506.91.10 was not the proper classification. *Id.* Such an approach does not provide an adequate basis for rejecting AMMWF's arguments or present a supported determination. For example, in *Jinko Solar*, the Court found that Commerce has failed to sufficiently address evidence that detracted from a surrogate value selection when it "concluded that SolarWorld 'provided no evidence or basis for finding that imports under HTS subheading 8548.10 would not include scrap solar cells . . . .'" *Jinko Solar*, 229 F. Supp. 3d at 1354. As the Court explained, Commerce failed to address an argument that the language of the HTS heading used indicated that it covered products different from those at issue. *Id.* at 1355. Consequently, the Court found that, "{b}ecause Commerce did not address SolarWorld's argument, the agency has failed to adequately explain how its decision is reasonable in light of the record as a whole, including the evidence that detracts from its conclusion." *Id.* (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Here, too, Commerce did not address AMMWF's argument regarding the HTS language in any manner, much less explain how its determination was supported notwithstanding this information. These shortcomings in Commerce's determination is only amplified in light of the absence of evidence indicating that HTS 3506.91.10 does accurately described the respondents' glue input.

In short, in selecting the surrogate value to be used for Guyu's and Jinlong's glue input, Commerce failed to demonstrate that it considered the record as a whole, failed to explain how its

determination was supported, and failed to adequately address AMMWF's argument. Neither Commerce nor the respondents pointed to anything on the record to suggest that data for HTS 3506.91.10 accurately represented the glue input used. In contrast, AMMWF highlighted that the very description of this HTS category indicated that it did not represent respondents' glue inputs. As such, Commerce's summary rejection of AMMWF's argument and reliance on HTS 3506.91.10 solely because AMMWF did not "cite record evidence, such as information about the glue used by Jinlong or Guyu or industry standards with respect to this input . . ." is not supported by substantial evidence or otherwise in accordance with law. IDM at 15.

### D.   Commerce's Calculation of the Dumping Margin for Companies Eligible for the Separate Rate Was Unsupported by Substantial Evidence and Not in Accordance with Law

For the reasons explained above, Commerce's determination of the margin for Jinlong and Guyu is flawed as a result of Commerce's failure to explain and support certain aspects of its determination. Commerce based its antidumping duty margin for non-selected companies that demonstrated their eligibility for a separate rate on the margin calculated for Jinlong and Guyu. *See id.* at 27. The flaws in the determination with respect to Jinlong's and Guyu's margin calculations thus affected the determination of the separate rate. As such, to the extent that reconsideration of the determination with respect to the issues identified herein results in a new margin determination for these companies, Commerce must also reconsider and update the separate rate determination to reflect the updated margins for Jinlong and Guyu.

## VI.   **CONCLUSION**

For the reasons provided above, AMMWF respectfully requests that the Court remand Commerce's determination regarding its calculation of the dumping margin in the 2017-2018 administrative review of the antidumping duty order on multilayered wood flooring from China.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the American Manufacturers of Multilayered Wood Flooring*

Dated: July 16, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the American Manufacturers of Multilayered Wood Flooring's Memorandum in Support of Rule 56.2 Motion for Judgment upon the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 8,990 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

American Manufacturers of Multilayered Wood Flooring
(Representative Of)

July 16, 2021
(Date)