NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et. al*,<br><br>          Defendant-Intervenors. | Before: Hon. Richard K. Eaton,<br>        Senior Judge<br><br>Court No. 20-03948<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Page 9 |

<u>THE AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING'S REPLY BRIEF</u>

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to American Manufacturers of Multilayered Wood Flooring*

Dated: November 15, 2021

Ct. No. 20-03948                                                                          NON-CONFIDENTIAL VERSION

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ......................................................................................................................... 1

    A. Commerce's Speculative Concerns Do Not Render Its Financial Ratio Calculation Reasonable or Sufficiently Explained ......................................... 1

    B. Defendant and Defendant-Intervenors Fail to Demonstrate that Commerce's Assumption of 24 Working Days per Month Was Sufficiently Explained or Supported by Record Evidence ....................................... 4

    C. No Record Evidence Supports the Valuation of the Glue Input Using HTS 3506.91.10 ................................................................................................ 8

III. CONCLUSION ................................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*CS Wind Viet. Co. v. United States*,
    832 F.3d 1367, 1377 (Fed. Cir. 2016)..................................................................................6

*Elkay Mfg. Co. v. United States*,
    34 F. Supp. 3d 1369 (Ct. Int'l Trade 2014) .........................................................................3

*Itochu Bldg. Prods., Co. v. United States*,
    163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ..................................................................2, 11

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019)..............................................................................................6

*Mitsubishi Heavy Indus., Ltd. v. United States*,
    24 CIT 275, 97 F. Supp. 2d 1203 (2000) .............................................................................2

*Qingdao Sea-Line Trading Co. v. United States*,
    36 CIT 451, 457 (2012) .......................................................................................................6

*SolarWorld Ams., Inc. v. United States*,
    910 F.3d 1216 (Fed. Cir. 2018)....................................................................................11, 12

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002).........................................................................................12

*Union Steel Manufacturing Co. v. United States*,
    36 CIT 717, 837 F. Supp. 2d 1307 (2012) .......................................................................6, 7

**Administrative Materials**

*Antidumping Methodologies in Proceedings Involving Non-Market Economies:
    Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't
    Commerce June 21, 2011) ...................................................................................................7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
    From the People's Republic of China*, 80 Fed. Reg. 40,998 (Dep't Commerce
    July 14, 2015).....................................................................................................................12

Ct. No. 20-03948 NON-CONFIDENTIAL VERSION

I. **INTRODUCTION**

On behalf of the American Manufacturers of Multilayered Wood Flooring ("AMMWF"), we respectfully submit the following reply brief concerning the October 18, 2021 response briefs submitted by Defendant United States and by Defendant-Intervenors Jiangsu Guyu International Trading Co., Ltd. ("Guyu"), Yihua Lifestyle Technology Co., Ltd., Metropolitan Hardwood Floors, Inc., Gallerher Corp., and Galleher LLC, and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), Jiangsu Keri Wood Co., Ltd., and Sino-Maple (Jiangsu) Co., Ltd. Def.'s Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. (Oct. 18, 2021), ECF No. 43 ("Def. Br."); Def.-Intervenor's Resp. Br. (Oct. 18, 2021), ECF No. 44 ("Guyu Br."); Resp. in Opp'n to American Manufacturers of Multilayered Wood Flooring's Mot. for J. on the Agency R. by Yihua Lifestyle Technology Co., Ltd. (Oct. 18, 2021), ECF No. 42 ("Yihua Br."); Def.-Intervenors' Opp'n to Pl.'s 56.2 Mot. for J. on the Agency R. (Oct. 18, 2021), ECF No. 45; Resp. Br. of Intervenor Defs. Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., *et. al.* (Oct. 18, 2021), ECF No. 41.

II. **ARGUMENT**

A. **Commerce's Speculative Concerns Do Not Render Its Financial Ratio Calculation Reasonable or Sufficiently Explained**

Defendant and Defendant-Intervenors assert that the U.S. Department of Commerce ("Commerce") properly calculated the overhead financial ratio. Def. Br. at 19-23; Yihua Br. at 6-10; Guyu Br. at 2-3. Specifically, they argue that Commerce's stated concern regarding the potential for double counting indirect labor expenses was sufficient to support the agency's adjustment to the overhead ratio to reduce the amount treated as overhead expenses. Def. Br. at 19-23; Yihua Br. at 6-10; Guyu Br. at 2-3. These claims fail to demonstrate that Commerce's speculation about what may have been included as overhead in AMMWF's proposed calculation

1

constitutes substantial evidence or that the agency provided an adequate explanation for its determination. Consequently, these arguments should be rejected.

To start, Defendant's argument is largely based on a discussion of information contained in Sigstrat S.A.'s ("Sigstrat") financial statement that supposedly supports Commerce's determination. Def. Br. at 20-22. None of this information, however, was discussed, or even alluded to, by the agency in its final determination. Issues and Decision Memorandum accompanying *Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 78,118 (Dep't Commerce Dec. 3, 2020) (final results of antidumping duty admin. rev. and new shipper rev. and final deter. of no shipments; 2017-2018) at 8, P.R. 468 ("IDM"); Memorandum from Alexis Cherry and Sergio Balbontin, Int'l Trade Compliance Analysts, Off. VIII, Enf't and Compliance, to The File: *Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Surrogate Values for the Final Results* (Nov. 20, 2020) at 2, P.R.475-476 ("Final SV Memo"). Instead, Commerce stated only that it was rejecting AMMWF's proposal because it "d{id} not know the components of the {overhead expenses ("OH")} figure which may include indirect labor expenses, thus potentially overstating OH." IDM at 8. Thus, Defendant's argument constitutes *post hoc* rationalization that cannot be used to support Commerce's determination. *See, e.g., Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016) ("{T}he Court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962))); *Mitsubishi Heavy Indus., Ltd. v. United States*, 24 CIT 275, 281 n.9, 97 F. Supp. 2d 1203, 1209 n.9 (2000) ("Under the correct recitation of the post-hoc rationalization rule, '{t}he courts may not accept appellate counsel's *post hoc* rationalizations for

2

Ct. No. 20-03948 NON-CONFIDENTIAL VERSION

agency action . . . . It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" (quoting *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983))).

Indeed, Commerce's conclusion was based on the determination that it did not know what was included in overhead, as opposed to any analysis of the financial statement indicating that overhead did include indirect labor expenses. IDM at 8. Neither Defendant nor Defendant-Intervenors point to any aspect of Commerce's determination indicating that the agency based its decision on anything more than general, unspecified uncertainly about what was included in the overhead expense calculation and speculation about the potential of double counting. Def. Br. at 19-23; Yihua Br. at 6-10; Guyu Br. at 2-3. As AMMWF previously explained, the Court has faulted Commerce when the agency has made adjustments to the financial ratios based too heavily on speculation. *See Elkay Mfg. Co. v. United States*, 34 F. Supp. 3d 1369, 1382 (Ct. Int'l Trade 2014). As Commerce has done so here, its financial ratio calculation should not stand.

Further, while Defendant asserts that "Commerce did not fail to consider record evidence which supports an alternative conclusion{,}" Def. Br. at 20, this is not supported by the agency's determination. In particular, Commerce stated that it "d{id} not know the components of the OH figure" used in AMMWF's financial ratio calculation. IDM at 8. However, this figure ties directly to the amount expressly identified in Sigstrat's financial statement as "Production overheads." *Compare* Letter from Clark Hill PLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Submission of Surrogate Values* (Aug. 23, 2019) at SV-9, Note 4, "Operating Result Analysis", P.R. 317-320 ("Guyu SV Submission"), *with* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China:*

3

*Case Brief* (July 8, 2020) at Exhibit 1, C.R. 351, P.R. 444 ("AMMWF Case Br.").[1] Thus, Sigstrat's financial statement leaves no doubt that this amount constitutes overhead expenses. Nonetheless, Commerce treated only 41% of these expenses as overhead expenses based on a broad and unexplained concern regarding the possibility of double counting. *See* American Manufacturers of Multilayered Wood Flooring's Mem. In Supp. of its Rule 56.2 Mot. for J. on the Agency R. (July 16, 2021), ECF No. 38 at 17 ("AMMWF Br."); Guyu SV Submission at SV-9, Note 4, "Operating Result Analysis"; Final SV Memo at Attachment 1, sheet "Financial Ratios." Commerce has failed to explain how it is reasonable to treat more than 50% of the expenses expressly identified as production overhead as something other than overhead expenses, and Defendant and Defendant-Intervenors fail to explain how Commerce's conclusory, speculative concerns overcomes this information. Accordingly, Commerce's calculation of the overhead financial ratio is not supported by the record and has not been adequately explained.

### B. Defendant and Defendant-Intervenors Fail to Demonstrate that Commerce's Assumption of 24 Working Days per Month Was Sufficiently Explained or Supported by Record Evidence

Defendant and Defendant-Intervenors argue that Commerce's labor rate calculation was appropriate and consistent with its methodology. Def. Br. at 8-13; Yihua Br. at 10-14; Guyu Br. at 3-4. These arguments, however, do not show that Commerce's determination is supported by the record or that the agency considered all the information before it to make a reasoned decision regarding the best available information; instead, they rely on Commerce's conclusory statements regarding its normal practice and obfuscate the issue that is before the Court. Accordingly, these arguments do not persuade and should be rejected.

---

[1]   Sigtrat's financial statement identifies a total of RON 8,512,590 as "Indirect production expenses" in Note 7 of the "Notes to Financial Situation" and as "Production overheads" in Note 4 of the "Operating Result Analysis."

4

Defendant begins by defending Commerce's reliance on the Institutul National de Statistica ("INSSE") data for the labor surrogate value instead of the *Trading Economics* data AMMWF had proposed in its case brief. Def. Br. at 9-10. However, AMMWF has not challenged Commerce's use of the INSSE data; instead, AMMWF's argument is limited to Commerce's improper reliance on an assumption of 24 working days per month to calculate an hourly wage rate.[2] AMMWF Br. at 19-24. As such, Defendant's arguments regarding the propriety of using the INSSE data are moot.

Further, Defendant's argument incorrectly conflates the use of the INSSE data—which was obtained from one source—with the assumption of 24 working days per month—which was obtained from an entirely separate source. Specifically, AMMWF argued that Commerce's rejection of its working days per month calculation was unsupported in part because the agency's bases for rejecting these data were equally true for the data relied on by Commerce. *Id.* at 22. In response, Defendant states that this argument "fails . . . because Commerce relied on INSSE data which are official government data for Romania . . . ." Def. Br. at 9. This misses the point and is not relevant to AMMWF's argument. While the INSSE data are official Romanian government data, the assumption of 24 working days per month was not obtained from and is in no way connected to the INSSE data; there is nothing on the record to suggest that it has any relation to Romania or to the wood flooring (or wood products) industry. In other words, the assumption of 24 working days per month was derived from a secondary source and is not specific to Romania.

---

[2] As is clear from its case brief, AMMWF's argument regarding the working days per month used to calculate an hourly wage rate was independent from its argument that the *Trading Economics* data should be used for the surrogate labor rate. AMMWF Case Br. at 6-7 (arguing that the *Trading Economics* data should be used and arguing, "{i}n the alternative, should the Department continue to use the wage data provided by Jinlong," that the working days per month should be revised).

Ct. No. 20-03948                                                                                          NON-CONFIDENTIAL VERSION

As such, Commerce's rejection of AMMWF's proposed working days per month for these reasons cannot be considered reasonable or supported by the record when the data the agency relied on suffer from the very same shortcomings.

Defendant next argues that Commerce properly relied on an assumption of 24 working days per month because it was consistent with its normal practice. *Id.* at 10-11. This cannot, in and of itself, justify Commerce's determination based on the record here. As AMMWF has explained, "an agency's statement of what it 'normally' does or has done before . . . is not, by itself, an explanation of 'why its methodology comports with the statute.'" *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (quoting *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001)); *see Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544 (Fed. Cir. 2019) ("Commerce's reasoning is insufficient. First, all this statement does is declare what Commerce 'normally' does or has done before,' but such a declaration is 'not, by itself, an explanation of 'why its methodology comports with the statute.'"); *Qingdao Sea-Line Trading Co. v. United States*, 36 CIT 451, 457 (2012) (explaining that "Commerce must do more than simply state that is conclusions are justified because they are in accord with actions in prior reviews" and noting that, "were reliance on past practice its sole reason for determining that the IMF Index was the best available information, the court would find its explanation wanting."). For example, in *Union Steel Manufacturing Co. v. United States*, the Court remanded Commerce's interest expense ratio calculation in part because:

> Commerce failed to consider an important aspect of the question before it, which was whether determining Union's interest expense ratio solely on the basis of data in that financial statement produced the most accurate result. A basic purpose of the antidumping statute is the accurate determination of dumping margins . . . . The court cannot identify within the Decision Memorandum an indication that Commerce had as its objective achieving the most accurate margin through the choice of data for measuring interest expenses during the POR. Instead, Commerce reasoned that using the 2008 financial statements accords with its practice and that

6

Union had not met a burden of showing that Commerce must depart from this practice.

36 CIT 717, 727, 837 F. Supp. 2d 1307, 1317 (2012). Here, too, Commerce's decision was not based on any comparison of the available data or consideration of which data would produce the most accurate dumping margin. *See* IDM at 13. That Commerce followed its normal practice does not absolve the agency from undertaking an examination of the record as a whole and explaining why its determination is supported in light of that record.

While Defendant asserts that Commerce did explain why it declined to rely on AMMWF's data, this explanation highlights the unreasonableness of the agency's determination. *See* Def. Br. at 12. Specifically, AMMWF had provided information obtained from the Organization for Economic Cooperation and Development ("OECD") regarding annual hours worked for various OECD countries. *See* AMMWF Case Br. at 7. As Defendant notes, Commerce stated that these data "would employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor." IDM at 13; Def. Br. at 12. But, as noted above, this is equally true of the 24 working days per month assumption that was used by Commerce. This assumption was obtained from its *Labor Methodologies* notice, which is not specific to Romania and is a secondary source. *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011). Moreover, AMMWF placed the OECD data on the record and supported this information with a qualitative analysis regarding the number of working days in a year given a reasonable amount of time off for weekends, holidays, and other non-working days. *See* AMMWF Case Br. at 7-8. In contrast, there is no information on the record concerning how the 24 working days per month assumption was derived or what data, if any, were used to develop

this assumption. Commerce's failure to consider, much less address, any of this information, renders its determination unsupported.

Finally, Defendant asserts that Commerce adequately addressed AMMWF's argument regarding vacation days, sick days, and holidays because it stated that AMMWF failed to show that the *Trading Economics* data did not raise the same concern. Def. Br. at 12. As explained in AMMWF's opening brief, however, this addresses an issue that has not been raised. AMMWF Br. at 23-24; AMMWF Case Br. at 7-8. As is clear from its case brief, AMMWF argued that Commerce's assumption of 24 working days per month was unreasonable in part because it could not account for vacation days, sick days, and holidays. AMMWF Br. at 23-24; AMMWF Case Br. at 7-8. Thus, this argument relates specifically to, and only to, the working days per month assumption Commerce relied on regardless of the labor cost data used. In other words, this argument is wholly unrelated to using *Trading Economics* instead of INSSE data. As such, neither Commerce nor Defendant have addressed the actual issue identified by AMMWF and instead provide an answer to a question that was not asked. For this same reason, Defendant's claim that Commerce's determination was sufficiently specific if unavailing. Def. Br. at 12. AMMWF has not argued that Commerce's determination was not detailed enough; instead, Commerce addressed an argument that was not raised by AMMWF and, in doing so, entirely ignored the actual argument presented. As Defendant relies only on Commerce's response to an argument that was not made and that does not address the actual issue raised by AMMWF, it has failed to demonstrate that Commerce's determination was supported.

C. **No Record Evidence Supports the Valuation of the Glue Input Using HTS 3506.91.10**

Defendant and Defendant-Intervenors argue that Commerce's reliance on import data for Harmonized Tariff Schedule ("HTS") 3506.91.10 to value the respondents' glue input is supported

8

by the record and sufficiently explained. Def. Br. at 13-16; Guyu Br. at 4-5; Yihua Br. at 14-16. In support of this contention, Defendant and Defendant-Intervenors argue that Guyu reported that HTS 3506.91.10 was the appropriate category for its glue input and described its glue input, HTS 3506.91.10 was a more specific HTS category, and AMMWF did not provide information demonstrating that inputs under HTS 3506.91.10 could not be used. Def. Br. at 13-16; Guyu Br. at 4-5; Yihua Br. at 14-16. None of these factors support Commerce's determination or demonstrate that the agency's surrogate value selection was reasonable or sufficiently explained in light of the record as a whole. Thus, Defendant's and Defendant-Intervenors' arguments should be rejected.

First, the fact that Guyu identified HTS 3506.91.10 as the appropriate category and described its glue input does not support Commerce's determination. As Defendant notes, Guyu [

]. Importantly, however, no party has explained how or provided any evidence demonstrating that [

] "{o}ptically clear free-film adhesives and optically clear curable liquid adhesives of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels." *See* AMMWF Br. at 26. Thus, Guyu's description of its glue input is immaterial because there is nothing to suggest that there is any connection between the description provided and the HTS category used.

Likewise, the fact that Guyu proposed this HTS category in its surrogate value submission does not constitute evidence to support Commerce's decision, as it is not tied to any information

Ct. No. 20-03948                                                                                      NON-CONFIDENTIAL VERSION

on the record. Following this logic, Guyu could have reported that its glue input was appropriately categorized under an HTS subheading specific to steel and Commerce would consider it the best available information notwithstanding the fact that the HTS subheading itself demonstrates that it is not appropriate. In fact, in its rebuttal brief, Guyu did not even address AMMWF's argument that HTS 3506.91.10 was not the appropriate surrogate value for the respondents' glue input.[3] Letter from Clark Hill PLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Jiangsu Guyu International Trading Co., Ltd.'s Rebuttal Case Brief* (July 15, 2020) at 1-7, C.R. 352, P.R. 449; *see* AMMWF Case Br. at 9-10. In other words, Defendant and Defendant-Intervenors rely on the fact that Guyu proposed this HTS category, but can point to no actual information on the record—relied on by Commerce or otherwise—that provides any indication that HTS 3506.91.10 is appropriate for valuing respondents' glue input. Def. Br. at 13-16; Guyu Br. at 4-5; Yihua Br. at 14-16.

Second, Defendant highlights Commerce's policy to rely on prices most specific to the input in question and the fact that HTS 3506.91.10 is the "more specific" category. Def. Br. at 14 (citing Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004)). But this argument conflates two issues. While HTS 3506.91.10 may be *a* more specific category, there is nothing on the record supporting the conclusion that it is more specific to the input that was actually used. Consequently, the sole fact that HTS 3506.91.10 may encompass a more specific category of glue is not supportive of Commerce's determination if it does not encompass the type of glue used by the respondents. As AMMWF has explained, the only information on the record in this regard is the HTS subheading itself, which indicates that HTS 3506.91.10 does not encompass the type of glue used by the respondents. There is no information

---

[3] Nor did any other party addressed this argument in rebuttal. *See* IDM at 14-15.

on the record that provides any indication that this HTS category does represent or is related to the type of glue used by the respondents. As such, the specificity of this subheading does not support Commerce's determination. To the contrary, the fact that this HTS category is so specific—limited to glue "of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels"—renders it inappropriate for valuing the respondents' glue input.

Finally, contrary to Defendant's and Defendant-Intervenors' claims, AMMWF did point to record evidence indicating that HTS 3506.91.10 was not appropriate for valuing the respondents' glue input: the HTS category description itself, which states that it covers certain adhesives "of a kind used solely or principally for the manufacture of flat panel displays ot touch-sensitive screen panels." AMMWF Br. at 26-27. This information, in and of itself, constitutes evidence directly undermining Commerce's determination. *Id.* While Defendant points to the fact that the HTS category "describes glue that is 'principally' for the manufacture of flat panel displays or touch-sensitive screen panels, indicating this type of glue has other uses as well{,}" Def. Br. at 15, Commerce made no such finding in its determination. IDM at 15. As such, this constitutes additional *post hoc* rationalization that cannot support the agency's determination. *See, e.g., Itochu*, 163 F. Supp. 3d at 1337. Further, even if Commerce had provided this reasoning, the fact that this HTS category covers glue that is "solely or principally" for the manufacture of a product that is entirely distinct from wood flooring or any wood product, as opposed to glue used "solely" for this purpose, cannot constitute substantial evidence supporting the agency's determination.

Defendant's reliance on *SolarWorld Americas, Inc. v. United States* is likewise unavailing. Def. Br. at 16. In the proceeding underlying that case, Commerce engaged in a discussion of the product description provided by the respondent and how it related to the relevant HTS subheading based on a consideration of the subheading itself as well as the associated explanatory notes. *See*

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222-24 (Fed. Cir. 2018); Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 80 Fed. Reg. 40,998 (Dep't Commerce July 14, 2015) (final results of AD admin. rev. and final deter. of no shipments; 2012-2013) at 81-84 ("*Solar* IDM"). Commerce also explained why the selected HTS category was most appropriate even if it did not perfectly align with the input used. *See SolarWorld Ams., Inc. v. United States*, 910 F.3d at 1222-24; *Solar* IDM at 81-84. Here, in contrast, Commerce has undertaken no such analysis. Instead, the agency relies only on the fact that Guyu proposed HTS 3506.91.10 as the appropriate surrogate value. IDM at 14. And while Defendant alludes to "similarities detailed above between the respondents' inputs and the selected HS number{,}" Def. Br. at 16, neither Defendant, Commerce, nor any other party has identified information that provides any indication that the glue inputs used by respondents and the glue encompassed by the HTS 3506.91.10 share any similarities.

In short, Commerce failed to provide any explanation as to how this HTS category relates to Guyu's description of the input or why this HTS category was reasonable in light of the plain text of the subheading. Consequently, the HTS description directly undermines the agency's determination, and Commerce failed to address this evidence in any manner in its final determination. *See* IDM at 27. Therefore, Commerce's determination cannot be said to be supported by substantial evidence based on consideration of the record as a whole, including evidence that detracts from its determination. *Cf. Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002).

### III. CONCLUSION

For the reasons provided above, AMMWF respectfully requests that the Court remand Commerce's determination regarding its calculation of the dumping margin in the 2017-2018 administrative review of the antidumping duty order on multilayered wood flooring from China.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the American Manufacturers of Multilayered Wood Flooring*

Dated: November 15, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the American Manufacturers of Multilayered Wood Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 3,946 words.

/s/ Timothy C. Brightbill
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

American Manufacturers of Multilayered Wood Flooring
(Representative Of)

November 15, 2021
(Date)