Slip Op. 23-70

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
AMERICAN MANUFACTURERS OF                 :
MULTILAYERED WOOD FLOORING,               :
                                          :
          Plaintiff,                      :
                                          :
                                          :        Before: Richard K. Eaton, Judge
      v.                                  :
                                          :        Court No. 20-03948
                                          :
UNITED STATES,                            :
                                          :
                                          :
          Defendant,                      :
                                          :
                                          :
      and                                 :
                                          :
JIANGSU SENMAO BAMBOO AND                 :
WOOD INDUSTRY CO., LTD., *et al.*,        :
                                          :
          Defendant-Intervenors.          :
_____ :

**OPINION AND ORDER**

[U.S. Department of Commerce's final results are sustained in part, and remanded.]

Dated: May 5, 2023

*Stephanie M. Bell*, Wiley Rein LLP, of Washington, D.C., argued for Plaintiff American Manufacturers of Multilayered Wood Flooring. With her on the brief were *Timothy C. Brightbill* and *Tessa V. Capeloto*.

*Sonia M. Orfield*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Rachel A. Bogdan*,

Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

   *Stephen W. Brophy*, Husch Blackwell LLP, of Washington, D.C., for Defendant-Intervenors Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Jiangsu Keri Wood Co., Ltd., and Sino-Maple (Jiangsu) Co., Ltd. With him on the brief was *Jeffrey S. Neeley*.

   *Wenhui (Flora) Ji*, Mowry & Grimson, PLLC, of Washington, D.C., for Defendant-Intervenor Yihua Lifestyle Technology Co., Ltd. With her on the brief was *Kristin H. Mowry* and *Sarah M. Wyss*.

   *Mark R. Ludwikowski*, Clark Hill PLC, of Washington, D.C., for Defendant-Intervenor Jiangsu Guyu International Trading Co., Ltd. With him on the brief was *Courtney G. Taylor*.

   *Ronald M. Wisla*, Fox Rothschild LLP, of Washington, D.C., for Defendant-Intervenors Metropolitan Hardwood Floors, Inc., Galleher Corp., and Galleher LLC. With him on the brief were *Lizbeth R. Levinson* and *Brittney R. Powell*.

   Eaton, Judge: This case involves a challenge to the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") seventh administrative review of the antidumping duty order ("Order") covering multilayered wood flooring from the People's Republic of China ("China"). *See Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 78,118 (Dep't of Commerce Dec. 3, 2020) ("Final Results") and accompanying Issues and Decision Mem. (Nov. 20, 2020) ("Final IDM"), PR 468; *see also Multilayered Wood Flooring From the People's Republic of China*, 76 Fed. Reg. 76,690 (Dep't of Commerce Dec. 8, 2011), *amended by Multilayered Wood Flooring From the People's Republic of China*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012) (Order).

   Before the court is the motion for judgment on the agency record of Plaintiff American Manufacturers of Multilayered Wood Flooring ("Plaintiff"), "an *ad hoc* association whose members manufacture the domestic like product in the United States." Compl. ¶ 3, ECF No. 7; *see* Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 39 ("Pl.'s Br."); Pl.'s Reply Br., ECF No. 46. By its motion, Plaintiff asks the court to remand Commerce's determination of the zero percent

dumping margin calculated for each of the two mandatory respondents: Jiangsu Guyu International

Trading Co., Ltd. ("Guyu"), a Defendant-Intervenor in this case,[1] and a collapsed entity comprised

of Dalian Qianqiu Wooden Product Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong

Jinqiu Wooden Product Co., Ltd., and Fusong Qianqiu Wooden Product Co., Ltd. (collectively,

"Jinlong").[2] *See* Pl.'s Br. at 4, 29. The determination of these zero percent margins resulted in a

rate of zero percent as the "all-others" rate for those respondents not individually examined.[3] *See*

Final Results, 85 Fed. Reg. at 78,119. Plaintiff also contests this determination. *See* Pl.'s Br. at 28.

---

[1]     Guyu is a Defendant-Intervenor, along with Metropolitan Hardwood Floors, Inc., Galleher Corp., and Galleher LLC ("Metropolitan & Galleher"); Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Jiangsu Keri Wood, Co., Ltd., and Sino-Maple (Jiangsu) Co., Ltd. ("Jiangsu"); and Yihua Lifestyle Technology Co., Ltd. ("Yihua") (collectively, "Defendant-Intervenors").

[2]     Jinlong is not a party to this action.

[3]     Here, the respondents not individually examined that are eligible for the "all-others" rate are those companies that have rebutted Commerce's presumption that "all companies within the NME country are subject to governmental control and should be assigned a single antidumping duty rate," which Commerce terms the "NME-wide rate." Imp. Admin., U.S. Dep't of Com., *Separate-Rates Practice & Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries*, Policy Bulletin 05.1 at 1 (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf ("Policy Bulletin 05.1") (last visited Apr. 20, 2023). Respondents rebut this presumption—which has been called into question by this Court— by demonstrating "the absence of both *de jure* and *de facto* governmental control over its export activities." *Id.*; *see Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 47 CIT __, __, 617 F. Supp. 3d 1343, 1354 (2023). By demonstrating their independence from the Chinese government, the respondents not individually examined receive a separate rate. *See* Policy Bulletin 05.1 at 1.

"While this 'separate rate' is not technically an 'all-others' rate—an 'all-others' rate is limited solely to investigations under the statute—it is often referred to as the 'all-others' rate in administrative reviews." *Fusong Jinlong Wooden Grp. Co. v. United States*, 46 CIT __, __, 617 F. Supp. 3d 1221, 1232 n.22 (2022) (citations omitted). Commerce determines the all-others rate in investigations by taking a "weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C. § 1673d(c)(5)(A). Commerce has used the same method to determine the all-others rate in administrative reviews. *See* Final Results, 85 Fed. Reg. at 78,119 ("Generally, we look to [19

Plaintiff primarily contests Commerce's calculation of the surrogate financial ratio for manufacturing overhead and further argues that the surrogate values for labor and glue are unsupported by substantial evidence. *See id.* at 1-2.

Defendant the United States ("Defendant") opposes Plaintiff's motion and asks the court to sustain Commerce's Final Results. *See* Def.'s Resp. Br., ECF No. 43 ("Def.'s Br."). Defendant-Intervenors, including Guyu, also ask the court to sustain Commerce's Final Results and deny Plaintiff's motion. *See* Def.-Int.'s Resp. Br., ECF No. 44 ("Guyu Br."); Def.-Ints.' Resp. Br., ECF No. 45 ("Metropolitan & Galleher Br."); Def.-Ints.' Resp. Br., ECF No. 41 ("Jiangsu Br."); Def.-Int.'s Resp. Br., ECF No. 42 ("Yihua Br.").

Jurisdiction lies under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (B)(iii).[4] For the following reasons, the court finds that Commerce's calculations of the manufacturing overhead ratio, and the surrogate labor value are unsupported by substantial evidence and remands these calculations to Commerce for action consistent with this Opinion and Order. Because the court finds that Commerce's determination of the surrogate glue value is supported by substantial evidence, it is sustained. Because the separate rate (i.e., the "all-others" rate) for the respondents not individually examined depends on the margin assigned to the mandatory respondents, the court also remands the all-others rate determination.

---

U.S.C. § 1673d(c)(5)], which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents not individually examined in an administrative review.").

[4]     All references to the U.S. Code are to the 2018 edition.

# BACKGROUND

The antidumping duty Order on multilayered wood flooring from China has been in place since 2011. *See* Order, 76 Fed. Reg. at 76,690.

On December 3, 2018, Commerce published a notice of opportunity for interested parties[5] to request an administrative review of the Order. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 83 Fed. Reg. 62,293 (Dep't of Commerce Dec. 3, 2018).

After receiving requests to conduct an administrative review from interested parties, including Plaintiff, Commerce initiated the seventh review of the Order on March 14, 2019, covering the December 1, 2017, to November 30, 2018, period of review ("POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019); Letter from Wiley Rein LLP to Sec'y of Commerce (Dec. 31, 2018) ("Request for Administrative Review"), PR 27. On May 21, 2019, Guyu and Jinlong were selected as mandatory respondents. *See* Mem. from Sergio Balbontin & Alexis Cherry to Irene Darzenta Tzafolias, re: Antidumping Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Respondent Selection (May 21, 2019) ("Resp. Selection Mem.") at 6, PR 208, CR 116 (noting Guyu and Jinlong "account[ed] for the largest volume of subject merchandise imports during the POR").

---

[5]      The term "interested party," defined by statute, includes foreign manufacturers, producers, exporters, and U.S. importers of subject merchandise. *See* 19 U.S.C. § 1677(9)(A). Interested parties also include domestic manufacturers and producers of a domestic like product as well as associations of such manufacturers or producers, among others. *See id.* § 1677(9)(C), (E)-(F). Under Commerce's regulations, a request for an administrative review may be made by a domestic interested party or a foreign government, an exporter or producer covered by an order, and an importer of the merchandise. 19 C.F.R. § 351.213(b) (2018).

On February 6, 2020, Commerce issued its preliminary results. *See Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 6,911 (Dep't of Commerce Feb. 6, 2020) ("Preliminary Results") and accompanying Preliminary Decision Mem. (Jan. 31, 2020) ("PDM"), PR 387. In the Preliminary Results, Commerce calculated a zero percent dumping margin for each of the mandatory respondents. *See* Preliminary Results, 85 Fed. Reg. at 6,912. Using the weighted average of this dumping margin, the Department determined a zero percent rate for the respondents not individually examined (the "all-others" rate). *See id.*

On December 3, 2020, Commerce published its Final Results. *See* Final Results, 85 Fed. Reg. at 78,118. In the Final Results, Commerce modified its calculations to incorporate revisions to the financial ratios. *See* Mem. from Alexis Cherry & Sergio Balbontin to File, re: Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Surrogate Values for the Final Results (Nov. 20, 2020) ("Final SV Mem.") at 2, PR 475. Even with these modifications, Commerce continued to calculate a zero percent margin for the mandatory respondents and to determine a zero percent rate for the respondents not individually examined (the "all-others" rate). *See* Final Results, 85 Fed. Reg. at 78,119.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

In an antidumping case, Commerce must determine whether goods are being sold, or are likely to be sold, in the United States at less than fair value. *See* 19 U.S.C. § 1673. To make this determination, Commerce compares normal value and export price. *See id.* § 1677b(a).

To determine normal value, when subject merchandise is exported from a nonmarket economy ("NME") country[6] such as China, Commerce uses surrogate values both for the various factors of production used to make the subject merchandise, and for general expenses and profit. *See Nantong Uniphos Chems. Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1345, 1352-53 (2019); *see also Heze Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1318 (2021) (citation omitted). Factors of production include, but are not limited to, the "hours of labor required," the "quantities of raw materials employed" (e.g., the input for glue), and "amounts of energy and other utilities consumed." 19 U.S.C. § 1677b(c)(3)(A)-(C). To determine general expenses and profit, "Commerce usually calculates separate values for [1] selling, general and administrative ('SG&A') expenses, [2] manufacturing overhead and [3] profit." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 482, 318 F. Supp. 2d 1339, 1341 (2004). Financial ratios are used "to account for those production inputs that *cannot be wholly* attributed to a finite batch of subject merchandise." *CP Kelco U.S., Inc. v. United States*, 39 CIT __, __, No. 13-00288, 2015 WL 1544714, at *2 (Mar. 31, 2015) (not reported in Federal Supplement) (emphasis added). In other words, the financial ratios account for production inputs that do not solely correspond to the subject merchandise, but also are used repeatedly in making products or are attributable to

---

[6]     A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

more than one product. *See id.* Thus, here the surrogate financial ratio for manufacturing overhead was used to account for the percentage of overhead that should be attributed to the cost of manufacture of the multilayered wood flooring.

In order to find the surrogate value for the labor factor of production, Commerce usually uses industry-specific wage data from the primary surrogate country. *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't of Commerce June 21, 2011) ("Labor Rate Policy") ("[T]he Department finds that using the data on industry-specific wages from the primary surrogate country is the best approach for valuing the labor input in NME antidumping duty proceedings."); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 41 CIT __, __, 234 F. Supp. 3d 1315, 1319 (2017).

In valuing the factors of production, including the glue used to manufacture multilayered wood flooring, Commerce must use "the best available information." 19 U.S.C. § 1677b(c)(1); *see also SolarWorld Ams., Inc. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1254, 1275 (2017). When doing so, the statute requires Commerce to use, "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce additionally considers and "selects . . . surrogate values that are [1] publicly available, [2] are product-specific, [3] reflect a broad market average, and [4] are contemporaneous with the period of review." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (citation omitted). In making these selections, when determining what constitutes the best available information, Commerce must act according to the statute's purpose: "to obtain the most accurate

dumping margins possible." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 838,

159 F. Supp. 2d 714, 719 (2001) (citation omitted), *aff'd*, 60 F. App'x 797 (Fed. Cir. 2003). Thus,

Commerce's choice of the best available information must "evidence[] a rational and reasonable

relationship to the factor of production it represents." *Id.* (citations omitted).

## DISCUSSION

### I.    Commerce's Determination of the Manufacturing Overhead Ratio Lacks the Support of Substantial Evidence

#### A.    Components of the Ratio to Determine Manufacturing Overhead

Manufacturing overhead is one component of the value for general expenses and profit,

used to determine normal value. *See* 19 U.S.C. § 1677b(c)(1); *Shanghai Foreign Trade Enters.*

*Co.*, 28 CIT at 482, 318 F. Supp. 2d at 1341. To find the manufacturing overhead value, Commerce

first performs a ratio calculation using information derived from surrogate financial statements,

i.e., "financial statements of one or more companies that produce identical or comparable

merchandise in the surrogate country." *See Shanghai Foreign Trade Enters. Co.*, 28 CIT at 482,

318 F. Supp. 2d at 1341. The ratio for manufacturing overhead is found by "divid[ing] total

manufacturing overhead expenses by total direct manufacturing expenses." *Id.* This ratio is

"converted to [a] percentage[]." *Id.* The resulting percentage reflects the relationship of overhead

to manufacturing expenses. Commerce, then, multiplies this rate "by the derived manufacturing

cost of the product," which consists of the values for material, labor, and energy costs. *Dorbest*

*Ltd. v. United States*, 30 CIT 1671, 1715 n.36, 462 F. Supp. 2d 1262, 1301 n.36 (2006). The result

is the manufacturing overhead value. *See id.* In other words, Commerce performs the ratio

calculation for manufacturing overhead, then multiplies the result by the direct costs (materials,

labor, and energy) to reach the manufacturing overhead value, i.e., the percentage of

manufacturing overhead attributable to the manufacture of subject merchandise. Commerce then

includes this value (as part of the amount for general expenses and profit) in "the normal value of

the merchandise in question" by adding it to the factors of production. *Id.*; *see Nantong Uniphos*

*Chems. Co.*, 43 CIT at __, 415 F. Supp. 3d at 1351.

### B.      Commerce's Determination of Manufacturing Overhead

To construct manufacturing overhead for use in the manufacturing overhead ratio's

numerator, Commerce used data from the 2018 annual report of a Romanian company called

Sigstrat S.A. ("Financial Statement").[7] *See* Final IDM at 8; Final SV Mem., attach. I, PR 476; *see*

*also* Letter from Clark Hill PLC to Sec'y of Commerce (Aug. 23, 2019) ("Guyu SV Submission")

Ex. SV-9, PR 318. When doing so, however, the only financial statement entries Commerce

summed to find the numerator were (1) depreciation, (2) other materials, and (3) third-party service

expenses. *See* Final SV Mem., attach. I; Final IDM at 8. Commerce did not include the entry (or

any part of it) for indirect production expenses, which is found in Note 7 of the Financial Statement

as a component of the cost of goods sold. *See* Guyu SV Submission, Ex. SV-9. Commerce's reason

for not using the entry for indirect production expenses was that "the components of the [overhead]

figure [i.e., indirect production expenses][8] . . . may include indirect labor expenses," which would

---

[7]        Selection of the Financial Statement is not at issue here, as Plaintiff and the
mandatory respondents all "proposed relying on the 2018 annual report for Romanian producer
Sigstrat S.A. . . . for the surrogate financial ratios." Pl.'s Br. at 5. This is the only financial
statement on the record. *See* Def.'s Br. at 5.

[8]        There is no item labeled "overhead figure" in the Financial Statement. The notes of
the Financial Statement, however, contain an "indirect production expenses" entry (Note 7), which
Plaintiff raised in its administrative case brief. *See* Pet'r's Case Br. (July 8, 2020) at 4-5, PR 444,
CR 351. Commerce, therefore, by mentioning the "overhead figure," is referencing the indirect
production expenses entry in Note 7. *See* Final IDM at 8. Defendant, also, when stating "overhead
figure" means the indirect production expenses entry in Note 7. *See* Def.'s Br. at 22.

Similarly, when Plaintiff references "Sigstrat's identified overhead expenses" or "Sigstrat's reported overhead expenses," Plaintiff is referencing the entry for indirect production expenses, reported in Note 7 of the Financial Statement. *See* Pl.'s Br. at 17-18. Note 7 is titled "Analysis of operating result," and contains a breakdown of the cost of goods sold (expenditures on basic activity plus indirect production expenses). *See* Guyu SV Submission, Ex. SV-9.

It should be noted that the cost of goods sold entry in Note 7 is nearly identical to the cost of goods sold entry in Note 4. *Compare* Guyu SV Submission, Ex. SV-9 (Note 7), *with id.* (Note 4). Significantly, the line for "indirect production expenses" in Note 7 and the line for "production overheads" in Note 4 each contain the same amount (RON 8,512,590). *See* Guyu SV Submission, Ex. SV-9. Plaintiff, therefore, refers to these entries interchangeably. *See* Pl.'s Br. at 15 ("Sigstrat's financial statement explicitly states that its 'Indirect production expenses' or 'Production overheads' totaled RON 8,512,590."). These entries, found in line five of the tables below, are part of the cost of goods sold.

The entry for indirect production expenses is contained in Note 7 of the Financial Statement, the relevant parts of which are reproduced below:

| Note 7. Analysis of Operating Result | | | |
|------|------|------|------|
| No. | INDICATOR | PREVIOUS EXERCISE (2017) | CURRENT EXERCISE (2018) |
| 1 | Net turnover + stocks fluctuation | 32.347.136 | 34.682.935 |
| 2 | Cost of goods sold and services rendered (3+4+5) | 27.626.962 | 30.703.287 |
| 3 | Expenditure on basic activity | 18.568.260 | 21.270.123 |
| 4 | Expenditure on basic activity | 864.543 | 920.574 |
| 5 | *Indirect production expenses* | *8.194.159* | *8.512.590* |

Guyu SV Submission, Ex. SV-9 (emphasis added).

The entry for production overheads is contained in Note 4 of the Financial Statement, the relevant parts of which are reproduced below:

have been taken into account elsewhere in the labor factor of production. Final IDM at 8.
Commerce claimed that it took this step in order to prevent "potentially overstating [overhead]."
*Id.*

Plaintiff insists that by including only depreciation, other materials, and third-party service
expenses the Department understated the overhead value. Plaintiff argues:

> Under Commerce's calculation, only three items, totaling RON[9] 3,466,553 have
> been treated as overhead: depreciation, other materials, and third-party services. As
> a result, only 41% of Sigstrat's identified overhead expenses [i.e., indirect
> production expenses] have actually been included as overhead by Commerce (*i.e.*,
> 3,466,553 / 8,512,590). Given the numerous items that are typically encompassed
> by overhead expenses and the limited types of expenses treated as overhead in
> Commerce's calculation, it is not reasonable to presume that the remaining 59% of
> Sigstrat's reported overhead expenses exclusively, or even largely, covers indirect
> labor expenses. Instead, the most reasonable assumption is that the remaining
> overhead expenses at least partially cover other types of expenses. Thus, by treating
> this amount of Sigstrat's overhead expenses as part of materials, labor, and energy
> as opposed to overhead, the overhead expense has been understated.

Pl.'s Br. at 17-18.

For Plaintiff, Commerce erred in its calculation of the manufacturing overhead ratio by not

placing the full amount (or at least a large part) of the entry for indirect production expenses in the

| Note 4. Operating Result Analysis | | |
|---|---|---|
| **INDICATOR** | **PREVIOUS FINANCIAL YEAR (2017)** | **CURRENT FINANCIAL YEAR (2018)** |
| 1. Net turnover + stocks variation | 32.347.136 | 34.682.935 |
| 2. Cost of sold goods and services rendered (3+4+5) | 27.626.962 | 30.703.287 |
| 3. Main activity expenses | 18.568.260 | 21.270.123 |
| 4. Auxiliary activities | 864.543 | 920.574 |
| 5. *Production overheads* | *8.194.159* | *8.512.590* |

*See id.* (emphasis added).

[9]      All references to RON are to Romanian currency, the Romanian leu.

numerator of the ratio. Plaintiff claims that it was not reasonable for Commerce to "allocate[] only RON 3,466,553 to overhead expenses despite the fact that [the Financial Statement] explicitly states that its 'Indirect production expenses' or 'Production overheads' totaled RON 8,512,590." Pl.'s Br. at 15.

For its part, in its entirety, Commerce claims that, "the petitioner's methodology may also be distortive, as we do not know the components of the [overhead][10] figure *which may include indirect labor expenses*, thus potentially overstating [overhead]."[11] Final IDM at 8 (emphasis added). Apparently, Commerce believed that there was potential to double count indirect labor expenses if it placed the full amount of indirect production expenses in the numerator of its ratio calculation.

---

[10]     Commerce is here referencing the indirect production expenses entry stated in Note 7 of the Financial Statement. *See* Def.'s Br. at 19.

[11]     Commerce additionally stated:

> However, we agree with the petitioner that the ratio calculations should incorporate certain additional information from the notes to the financial statement with respect to [the cost of goods sold]. Accordingly, for the final results, we adjusted the [cost of goods sold] for the change in finished goods and removed the [cost of goods sold] of traded goods to derive the cost of manufacture of manufactured goods. We backed out the items that can be reasonably identified as [overhead] (*e.g.*, depreciation, other materials, third party expenses). We also used the [selling, general, and administrative] expenses indicated in the notes by adding the revenue and costs from note 4 of the financial statement (these are the bolded items) and then demonstrated how the figures from the notes agree with the total revenues, expenses, and profit from the income statement. We note also that the [selling, general, and administrative expenses] ratio denominator is the [cost of goods sold] and the profit denominator is the [cost of goods sold] plus the [selling, general, and administrative] expenses. Under this methodology we arrive at ratios of 12.68 percent for [overhead], 19.53 percent for [selling, general, and administrative expenses], and 1.29 percent for profit.

Final IDM at 8.

The double counting could occur if indirect labor expenses were included twice in Commerce's determination of normal value: once as a factor of production and again as a portion of overhead.[12] *See Risen Energy Co. v. United States*, 46 CIT __, __, 569 F. Supp. 3d 1315, 1335 & n.35 (2022), *appeal docketed*, No. 23-1550 (Fed. Cir. Mar. 3, 2023). Thus, to address the potential of "overstating labor costs" (by accounting for indirect labor expenses twice in its calculation of normal value), Commerce has previously indicated that it would "adjust the surrogate financial ratios when the available record information—in the form of itemized indirect labor costs—*demonstrates* that labor costs are overstated."[13] Labor Rate Policy, 76 Fed. Reg. at

---

[12]     As Commerce states in its Antidumping Manual, "[i]f indirect labor is included in the surrogate value for factory overhead . . . it need not be valued separately. If, however, it is not included in the surrogate value for factory overhead, it should be valued as part of labor." U.S. Dep't of Com., *Antidumping Manual*, *in* 1 JOSEPH E. PATTISON, ANTIDUMPING AND COUNTERVAILING DUTY LAWS 1065, app. B at 17 (2018 ed.).

[13]     Commerce's Labor Rate Policy further states:

[T]he Department will determine whether the facts and information available on the record warrant and permit an adjustment to the surrogate financial statements on a case-by-case basis. If there is evidence submitted on the record by interested parties *demonstrating that the NME respondent's cost of labor is overstated*, the Department will make the appropriate adjustments to the surrogate financial statements subject to the available information on the record. Specifically, when the surrogate financial statements include disaggregated overhead and selling, general and administrative expense items that are already included in the ILO's definition of Chapter 6A data, the Department will remove these identifiable costs items.

Labor Rate Policy, 76 Fed. Reg. at 36,094 (emphasis added). In other words, when overhead and selling, general, and administrative expenses are itemized, such that they indicate an amount for indirect labor expenses, and those indirect labor expenses are included in the labor factor of production, Commerce will not include the indirect labor expenses in its calculation of the surrogate financial ratios. This way, Commerce avoids including indirect labor expenses in both the ratios and the labor factor of production, and thus, avoids double counting such expenses.

36,093-94 (emphasis added). In other words, if it was demonstrated that indirect labor costs[14] were included in the numerator of the manufacturing overhead ratio, and that these same costs were included in the labor factor of production, the result would be distortive because this double counting would impermissibly increase normal value.

To avoid what it saw as the potential for distorting normal value, Commerce sought to exclude any indirect labor expenses from the numerator of its manufacturing overhead ratio calculation. To do this, the Department looked to the cost of goods sold entry in Note 7 of the Financial Statement. The cost of goods sold is calculated by adding "beginning inventory plus cost of goods purchased or manufactured minus ending inventory." SIDNEY DAVIDSON, CLYDE P. STICKNEY & ROMAN L. WEIL, FINANCIAL ACCOUNTING 805 (4th ed. 1985) (emphasis omitted). The cost of manufacture would normally be roughly equal to the sum of the factors of production plus manufacturing overhead. The cost of manufacture, used to find the cost of goods sold, is "the sum of material, fabrication and other processing costs incurred to produce the products under . . . review." U.S. Dep't of Com., *Antidumping Manual, in* 1 JOSEPH E. PATTISON, ANTIDUMPING AND COUNTERVAILING DUTY LAWS 1318, app. B Glossary of Terms (2018 ed.) ("*Antidumping Manual*"). Commerce "backed out" from the cost of goods sold entry "the items that can be reasonably identified as [overhead] (*e.g.*, depreciation, other materials, third party expenses)." Final IDM at 8. Commerce identified these three items from the profit and loss account/income statement of the Financial Statement. *See* Final SV Mem., attach. I; Def.'s Br. at

---

[14]     In its Labor Rate Policy, Commerce uses "costs" rather than "expenses." In the Final Results, it speaks of "labor expenses." Final IDM at 8. The use of the words "costs" and "expenses" interchangeably is not uncommon. *See* SIDNEY DAVIDSON, CLYDE P. STICKNEY & ROMAN L. WEIL, FINANCIAL ACCOUNTING 804, 817 (4th ed. 1985).

19-20. Commerce then used these three amounts as the value for overhead in the numerator of the overhead ratio. *See* Final SV Mem., attach. I.

After taking out these three amounts from the cost of goods sold, and adjusting the cost of goods sold for inventory, Commerce placed what remained of the cost of goods sold entry in the denominator of the manufacturing overhead ratio. *See id.*; Final IDM at 8. Commerce labeled this amount in the denominator as "Total Material, Direct Labor, and Energy Inputs." Final SV Mem., attach. I. Put another way, Commerce found the amount for manufacturing overhead expenses by identifying the amounts for depreciation, other materials, and third-party service expenses from the profit and loss account in the Financial Statement. *See id.*; Def.'s Br. at 19-20. Then, after adjusting for inventory, Commerce subtracted these three line items from the cost of goods sold to reach the denominator of the ratio for manufacturing overhead (i.e., total direct manufacturing expenses). *See* Final SV Mem., attach. I. The amount of the numerator is less than half the amount of the indirect production expenses entry, found in the surrogate financials. *See id.*; Guyu SV Submission, Ex. SV-9.

### C.      Significance of Plaintiff's Argument on Allocation of Costs Within Ratio for Manufacturing Overhead

For Plaintiff, Commerce's decision not to place the entire indirect production expenses entry, found in Note 7 of the Financial Statement, in the numerator of the ratio is unsupported by substantial evidence because the Department (1) did not explain why Plaintiff's preferred entry (indirect production expenses) was not the best available information to measure overhead, and (2) did not explain why the use of the indirect production expenses entry would be distortive. *See* Pl.'s Br. at 15-17. Regarding the best available information, Plaintiff argues that "Commerce has failed to calculate surrogate financial ratios in a manner consistent with the record such that the

resulting financial ratios are distorted and do not constitute the best available information."[15] *Id.*
at 15. Plaintiff, having proposed at the administrative level that the full amount of the entry for
indirect production expenses be placed in the numerator, claims that "Commerce pointed to no
information on the record demonstrating that double counting would occur if [Plaintiff's] proposed
calculation was used." *Id.* at 19; *see also* Pet'r's Case Br. (July 8, 2020) at 5, Ex. 1, PR 444, CR
351. Plaintiff argues, "Commerce's reliance on speculation regarding the double counting of costs
was not a sufficient basis for excluding amounts identified as indirect expenses in [the Financial
Statement] from overhead in its financial ratio calculation."[16] Pl.'s Br. at 17. In other words, for
Plaintiff, Commerce's finding that the indirect production expenses entry might include indirect
labor expenses is based on speculation and does not render its decision supported by substantial
evidence.

### D.   Commerce Did Not Substantiate Its Concern with Double Counting

Here, the problem lies with Commerce's decision to rely solely on those entries it could
identify as overhead from the profit and loss account/income statement when constructing the
numerator for the manufacturing overhead ratio. For Plaintiff, this decision is not reasonable,
primarily because it understates the amount of overhead, and because it is based on guesswork.

---

[15]   Although Plaintiff refers to the "surrogate financial ratios" in this quote, it only
contests one ratio, the manufacturing overhead ratio.

[16]   Apparently, allocating the entire amount of indirect production expenses to the
numerator is important to Plaintiff because it results in a larger manufacturing overhead value, and
thus a greater difference between normal value and export price. This is because the larger the
numerator of the ratio for manufacturing overhead and the smaller the denominator, the larger the
value determined as manufacturing overhead. The larger the value for manufacturing overhead,
the larger the amount for general expenses and profit. The larger the amount for general expenses
and profit, the larger normal value will be when this amount is added to the factors of production.
*See* 19 U.S.C. § 1677b(c)(1). Plaintiff's goal, then, is to increase normal value in hopes that
Commerce will determine a positive dumping margin.

*See* Pl.'s Br. at 19. Plaintiff notes that "only 41% of Sigstrat's identified overhead expenses [i.e., indirect production expenses] have actually been included as overhead by Commerce (*i.e.*, 3,466,553 / 8,512,590)." *Id.* at 17. Plaintiff faults Commerce for the lack of factual detail in its explanation for not using Plaintiff's proposed financial entry in Note 7 of the Financial Statement. In addition, Plaintiff points to the absence, from Commerce's calculation, of a large number of items that would normally constitute overhead—i.e., depreciation, insurance, taxes, repairs and maintenance, supervisory salaries, manufacturing supplies, and power. *See id.*; *see also Magnesium Corp. of Am. v. United States*, 20 CIT 1092, 1102, 938 F. Supp. 885, 896 (1996).

Plaintiff is right to point out that overhead normally includes many more things than the three that Commerce included in the numerator of the ratio. *See* DAVIDSON, STICKNEY & WEIL, *supra*, at 139 ("Manufacturing overhead includes a variety of indirect costs that provide a firm with productive capacity (depreciation, insurance, and taxes on manufacturing facilities, supervisory labor, and supplies for factory equipment)."); *see also What is Manufacturing Overhead and What Does It Include?*, ACCT. COACH, https://www.accountingcoach.com/blog/what-is-manufacturing-overhead-and-what-is-included (last visited Apr. 21, 2023) (indicating that manufacturing overhead includes "depreciation, rent and property taxes on the manufacturing facilities[;] depreciation on the manufacturing equipment[;] managers and supervisors in the manufacturing facilities[;] repairs and maintenance employees in the manufacturing facilities[;] electricity and gas used in the manufacturing facilities[;] indirect factory supplies, and much more"). Considering that these costs are normally incurred by a manufacturer, it is unreasonable for Commerce to not have found a way to include more from the universe of these items.

Moreover, as Plaintiff states, the Financial Statement explicitly identifies an entry for indirect production expenses (production overheads). *See* Pl.'s Br. at 17-18; *see also* Pl.'s Reply

Br. at 3-4 ("[The overhead] figure ties directly to the amount expressly identified in Sigstrat's financial statement as 'Production overheads.' Thus, Sigstrat's financial statement leaves no doubt that this amount constitutes overhead expenses."). The entry for indirect production expenses contains the same amount as the entry for production overheads. *See* Guyu SV Submission, Ex. SV-9; *see also* Pl.'s Br. at 15. While the Financial Statement does not break down exactly what the indirect production expenses entry includes, Commerce still must explain its statement that using it might be distortive. *See* Guyu SV Submission, Ex. SV-9; *NSK Corp. v. United States*, 33 CIT 1185, 1190, 637 F. Supp. 2d 1311, 1318 (2009) (citation omitted) ("To provide the requisite support, [Commerce] must offer more than conjecture and reasonably explain the basis for its decisions."); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citations omitted) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court. Specifically, in the anti-dumping context, a final determination by Commerce must include 'an explanation of the basis for its determination that addresses relevant arguments[] made by interested parties who are parties to the investigation or review.'").

In its entirety, Commerce's explanation for not using the indirect production expenses entry is that "the petitioner's methodology may also be distortive, as we do not know the components of the [overhead] figure which may include indirect labor expenses, thus potentially overstating [overhead]." Final IDM at 8. Speculatory conclusions are not supported by substantial evidence. *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("'Mere speculation' is not substantial evidence." (quoting *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017))). Since Commerce provided no such explanation, its claim that using the indirect production expenses entry in the numerator of the manufacturing overhead ratio may

be distortive is mere speculation. Moreover, limiting the overhead expenses in the numerator to depreciation, other materials, and third-party service expenses is unreasonable considering the universe of expenses normally thought of as overhead. Therefore, the court remands Commerce's determination of the manufacturing overhead ratio.

## II.     Commerce's Determination of the Surrogate Labor Value Lacks the Support of Substantial Evidence

### A.     Commerce's Calculation of the Hourly Labor Value

To calculate the surrogate hourly labor value (i.e., the surrogate value Commerce uses to determine the labor factor of production),[17] Commerce used data from Chapter 16 of the National Institute of Statistics of Romania.[18] *See* Mem. from Alexis Cherry & Sergio Balbontin, re: Antidumping Duty Administrative Review and New Shipper Review of Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Surrogate Values for the Preliminary Results (Jan. 31, 2020) ("Prelim. SV Mem.") at 6, PR 392; Final IDM at 12. This data stated monthly average net earnings,[19] in Romanian leu (RON), of RON 1,772 but did not specify the

---

[17]     To determine the value for the labor factor of production, Commerce multiplies the mandatory respondent's reported hours used in producing the subject merchandise by the surrogate value for wages per hour (e.g., 150 hours x $0.97/hr. = $144.50). *See Antidumping Manual*, *supra*, at 1066-68, app. B at 18-20. The result of this multiplication is the value for the labor factor of production ($144.50). *See id.* at 1067-68, app. B. at 19-20.

[18]     While Plaintiff contested the selection of this data at the administrative level, it does not do so here. *See* Pet'r's Case Br. at 5-7; Pl.'s Reply Br. at 5 & n.2. Thus, the court will not address Defendant's arguments pertaining to the data selection. *See* Def.'s Br. at 8-10, 12; *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (citation omitted) ("Our law is well established that arguments not raised in the opening brief are waived.").

[19]     Although Commerce's Labor Rate Policy expresses the Department's preference of using Chapter 6A data from the International Labor Organization ("ILO") to value labor, the Department stated that this preference "d[oes] not preclude reliance on data from another source."

hourly labor value. *See* Final IDM at 13; Prelim. SV Mem. at 6. To calculate the hourly labor

value, Commerce divided monthly average net earnings by twenty-four working days per month,

and eight working hours per day to reach an hourly rate of RON 9.23.[20] *See* Final IDM at 12-13.

Commerce used twenty-four working days and eight hours because it was "in accordance with our

---

Final IDM at 12; *see also* Labor Rate Policy, 76 Fed. Reg. at 36,094. In other words, Commerce
still must act consistent with the statute's direction of selecting the best available information to
determine surrogate values. *See* 19 U.S.C. § 1677b(c)(1); *see also* PDM at 31. Here, Commerce
did not use the ILO data because it found that "the National Institute of Statistics of Romania data
for the POR are the best available information for valuing labor because the data are
contemporaneous with the POR, industry-specific, and reflect all costs related to labor, including
wages, benefits, housing, and training." PDM at 31. Commerce stated that this Romanian labor
data was "specific to the manufacture of wood products" and "specific to the wood flooring
industry." Final IDM at 12.

20      Commerce's calculation is as follows:

RON 1,772 ÷ 24 working days ÷ 8 hours = 9.23 RON per hour.

*See* Mem. to File from Alexis Cherry, re: Antidumping Duty Administrative Review of
Multilayered Wood Flooring from the People's Republic of China; 2017-2018: Preliminary
Results Margin Calculation for Jiangsu Guyu International Trading Co., Ltd. (Jan. 31, 2020),
attach. VI, PR 397, CR 323-328.

The mandatory respondents reported their hours of labor in response to Commerce's
request for the number of direct and indirect "labor hours required to produce a unit of the
merchandise under consideration," i.e., the multilayered wood flooring. *See, e.g.*, Jinlong's Resp.
Sec. C & D Quest. (July 16, 2019), at D-11 to D-12, PR 278, CR 185. Mandatory respondent
Jinlong reported three companies' hours of labor required as follows: Fusong Jinlong's direct labor
hours were [[          ]] and its indirect labor hours were [[          ]]; Fusong Jinqiu's direct labor
hours were [[          ]] and its indirect labor hours were [[          ]]; and Fusong Qianqiu's direct
labor hours were [[          ]] and its indirect labor hours were [[          ]]. Jinlong's Resp. Sec. C
& D Quest. (July 16, 2019), Ex. D-8, CR 213. Accordingly, Jinlong reported a total of
[[          ]] direct labor hours and [[          ]] indirect labor hours. *Id.* Its "average" (i.e., the
result from dividing Jinlong's total direct or indirect labor hours by its total output of multilayered
wood flooring, in square meters) was [[          ]] for direct labor and [[          ]] for indirect labor.
*Id.*

Mandatory respondent Guyu reported its hours of labor required in an exhibit in its
questionnaire response. *See* Guyu's Resp. Sec. C & D Quest. (July 10, 2019), Ex. D-6-5, PR 275,
CR 182. The total indirect labor hours were [[          ]] and the total direct labor hours were
[[          ]]. *Id.* The factor of production was [[          ]] for indirect labor and [[          ]] for direct
labor. *Id.*

practice."[21] Final IDM at 13. The practice, to which Commerce refers, is found in its Labor Rate

Policy, which states, "[w]here data is not available on a per-hour basis, the Department converts

that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5

working days a week and 24 working days per month." Labor Rate Policy, 76 Fed. Reg. at 36,094

n.11. It is worth noting that this policy is found in a footnote to the Labor Rate Policy, and no

explanation is provided as to its source or why it is reasonable to employ. Moreover, while the

Labor Rate Policy as a whole, was the subject of notice-and-comment rulemaking and appears as

a notice in the Federal Register, it is not a regulation. *See id.* at 36,092.

Plaintiff argues that the Department's "assumption of 24 working days per month" is

unreasonable. Pl.'s Br. at 19. For Plaintiff, using twenty-four working days per month "overstates

the total number of working hours in a month and, consequently, results in an understated surrogate

hourly labor rate."[22] *Id.* at 23.

---

[21]        Commerce's Labor Rate Policy states:

[T]he Department will determine whether the facts and information
available on the record warrant and permit an adjustment to the surrogate financial
statements on a case-by-case basis. If there is evidence submitted on the record by
interested parties demonstrating that the NME respondent's cost of labor is
overstated, the Department will make the appropriate adjustments to the surrogate
financial statements subject to the available information on the record. Specifically,
when the surrogate financial statements include disaggregated overhead and
selling, general and administrative expense items that are already included in the
ILO's definition of Chapter 6A data, the Department will remove these identifiable
costs items.

Labor Rate Policy, 76 Fed. Reg. at 36,094.

[22]        Plaintiff's assertion is based on the idea that, if hours worked per month is
higher/overstated because of a higher number of working days per month, the hourly labor value
will be lower/understated. For instance, assuming monthly wages are $1,000 and there are 20
working days per month and 8 hours per day, the hourly labor value is $6.25 per hour. If, however,
there are 24 working days per month and 8 hours per day (resulting in an "overstatement" of hours
worked per month), the hourly labor value is $5.21 per hour (an "understated" labor value).

Plaintiff makes two major points. First, while Commerce states how its policy works, it does not state how it was developed or if its assumptions are based on substantial evidence. *See id.* at 22; *see also* Pl.'s Reply Br. at 6-8. Relatedly, Plaintiff insists that the policy does not represent the best available information:

> [R]elying on 24 working days per month to calculate the surrogate labor rate solely because that is the agency's normal practice does not constitute a sufficient explanation of the agency's determination here and fails to demonstrate that Commerce relied upon the best available information to value the labor surrogate value based on the record before it as required by the statute.

Pl.'s Br. at 22.

In addition, Plaintiff claims that Commerce's rejection of Plaintiff's proposed data for calculating the hourly labor value is also unsupported by substantial evidence. Plaintiff argues that neither of the two reasons Commerce stated in its Final IDM "provide a reasoned basis for following the methodology used in the final determination or for rejecting [Plaintiff's] data." *Id.* at 20-21. The two reasons Commerce provided for using the numbers in its Labor Rate Policy were: (1) doing so was "in accordance with our practice" and (2) "[t]o use the [Organization for Economic Cooperation and Development] data suggested by the petitioner would employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor." Final IDM at 13. Plaintiff maintains, "[a]s Commerce failed to adequately address [Plaintiff's] arguments and to sufficiently explain its determination in light of the record as a whole, its calculation of the surrogate labor rate based on an assumption of 24 working days per month is not supported by substantial evidence and otherwise in accordance with law." Pl.'s Br. at 19-20.

As an initial matter, it is important to note that, unlike with some unexplained policies, *see Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 47 CIT __, __, 617 F. Supp. 3d

1343 (2023), Commerce has identified the statutory source for establishing its Labor Rate Policy.

In the notice in the Federal Register containing this policy, Commerce cites section 773(c) of the

Tariff Act of 1930, which is codified at 19 U.S.C. § 1677b(c). *See* Labor Rate Policy, 76 Fed. Reg.

at 36,092. This section of the statute states that, in an NME case:

> [Commerce] shall determine the normal value of the subject merchandise on the
> basis of the value of the factors of production utilized in producing the merchandise
> and to which shall be added an amount for general expenses and profit plus the cost
> of containers, coverings, and other expenses. Except as provided in paragraph (2),
> the valuation of the factors of production shall be based on the best available
> information regarding the values of such factors in a market economy country or
> countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1). The statute then states that, when Commerce is valuing the factors of

production, it "shall utilize, to the extent possible, the prices or costs of factors of production in

one or more market economy countries that are—(A) at a level of economic development

comparable to that of the nonmarket economy country, and (B) significant producers of

comparable merchandise." *Id.* § 1677b(c)(4). Thus, the legal authority for establishing the policy

is not at issue.

What is at issue, however, is Commerce's failure to identify the source of the numbers in

its Labor Rate Policy and its reasons for using them. As Plaintiff argues, "there is no information

on the record concerning how the 24 working days per month assumption was derived or what

data, if any, were used to develop this assumption." Pl.'s Reply Br. at 7-8; *see also* Pl.'s Br. at 22

(arguing that, while Commerce faulted Plaintiff for using data to calculate the hourly labor value

that is not specific to Romania and that utilizes secondary sources unrelated to the source used to

value labor, "there is nothing on the record to suggest that the assumption Commerce relied on is

specific to Romania, is from a primary source, or relates to the source used to value labor").

Commerce's sole justification is that its use of twenty-four working days per month was "in accordance with our practice." Final IDM at 13. As noted, this policy appears in a footnote[23] to Commerce's Labor Rate Policy and states its assumption with respect to twenty-four working days, 5.5 working days per week, and eight working hours per day, but no justification for the assumptions. For instance, Commerce offers no explanation for how it settled on twenty-four working days and therefore gives no insight on how its policy was developed. Thus, Commerce has not offered an adequate explanation because conclusory statements are not sufficient to support, with substantial evidence, Commerce's decision. *See Jindal Poly Films Ltd. of India v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1379, 1386 (2019) ("Based on Commerce's conclusory statements, the court cannot discern the path of Commerce's decision-making nor determine that it is supported by substantial evidence." (first citing *NMB Singapore Ltd.*, 557 F.3d at 1319; and then citing *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016)));

---

[23]     The footnote in Commerce's Labor Rate Policy is:

The Department sorts the ILO data based on data parameters in the following order:
1. "Sub-classification," *i.e.,* If there is no industry-specific data available for the surrogate country within the primary data source, *i.e.,* ILO Chapter 6A data, the Department will then look to national data for the surrogate country for calculating the wage rate;
2. "Type of Data," *i.e.,* reported under categories compensation of employees and labor cost. We use labor cost data if available and compensation of employees where labor cost data are not available;
3. "Contemporaneity," *i.e.,* the Department uses the most recent earnings/wage rate data point available;
4. The unit of time for which the wage is reported. The Department selects from the following categories in the following hierarchy: (1) per hour; (2) per day; (3) per week; or (4) per month. Where data is not available on a per-hour basis, the Department converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month.

Labor Rate Policy, 76 Fed. Reg. at 36,094 n.11. The fourth number is the one relevant here.

*see also Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019) (citations omitted) ("Commerce must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable, including as to calculation methods."). Given Commerce's failure to explain why it used twenty-four working days per month, Plaintiff is correct in claiming that there is no evidence that using this number will result in the best available information.

Plaintiff, on the other hand, has offered at least some data tending to show that the number of hours actually worked for 2018 was far fewer than the number resulting under Commerce's calculation, which detracts from the reasonableness of using the numbers in Commerce's policy. *See* Pl.'s Br. at 19, 23.

Specifically, Plaintiff submitted data on "average annual hours actually worked per worker" in Organization for Economic Cooperation and Development ("OECD") countries.[24] *See* Pet'r's Case Br. at 7-8. For these countries, the average number of hours worked per worker in the year 2018 was 1,734. *See* Pl.'s Br. at 19. Calculating annual hours worked by assuming, as Commerce does, that there are twenty-four working days per month and eight hours per day, however, produces 2,304 annual hours worked. *See id.* at 19; *see also* Pet'r's Case Br. at 7. Thus, for Plaintiff, because Commerce's use of twenty-four working days per month results in an annual hours worked number that is incompatible with the OECD data showing actual annual hours

---

[24]     Romania is not an OECD country. *See List of OECD Member Countries – Ratification of the Convention on the OECD*, ORG. ECON. COOP. & DEV., https://www.oecd.org/about/document/ratification-oecd-convention.htm (last visited Apr. 21, 2023); *see also* Letter from Wiley Rein LLP to Sec'y of Commerce (Aug. 23, 2019) Ex. 5C, PR 330, CR 239. It is, however, a European country.

worked, Commerce's use of this number in its calculation is not supported by substantial evidence.[25] *See* Pl.'s Br. at 19, 24.

Commerce did not provide a reasonable explanation, supported by substantial evidence, for rejecting Plaintiff's proposed data. In its Final IDM, Commerce stated, "[t]o use the OECD data suggested by [Plaintiff] would employ a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor." Final IDM at 13. Plaintiff points out, however, the same fault that Commerce found with its data applies to Commerce's. *See* Pl.'s Br. at 22. That is, nothing on the record indicates that the use of twenty-four working days per month is in any way specific to Romania. Indeed, there appears to be no source at all for Commerce's number. As relevant here, Plaintiff had introduced the OECD data to demonstrate that it was unreasonable for Commerce to use twenty-four working days per month

---

[25]     At the administrative level, Plaintiff additionally argued that Commerce should use the OECD data to calculate the surrogate hourly labor value for its Final Results. *See* Pet'r's Case Br. at 7-8. Here, however, Plaintiff argues that Commerce did not provide "a reasoned basis for . . . rejecting the OECD data in favor of its own methodology." Pl.'s Br. at 22-23.

Plaintiff also provided its own analysis of working days per month. *See* Pet'r's Case Br. at 7-8; Pl.'s Br. at 23. Plaintiff indicated that, based on a five-day work week, there are roughly twenty-two working days per month, and, after accounting for government holidays, vacation days, and sick days, there are an estimated nineteen working days per month. *See* Pet'r's Case Br. at 8; Pl.'s Br. at 23.

Before Commerce, Plaintiff argued that "24 working days is even greater than the number of Monday through Friday working days in any given month (*i.e.*, 21.7 = 365 / 12 * 5 working days / 7 days a week)." Pet'r's Case Br. at 7. Plaintiff further argued,

> Furthermore, 21.7 days per month does not count any government holidays, vacation days, or sick days. Even a modest amount for those days off (27-35 days per year) results in 19 working days per month. As Jinlong's estimate demonstrably overstates the total number of working hours in a month, the Department should not rely on these data and instead should rely on the data provided by [Plaintiff] concerning the average annual hours worked per worker in 2018.

*Id.* at 8.

in its calculation. Other than saying that the OECD data was not specific to Romania, the Department did not attempt to demonstrate that it was reasonable to use the twenty-four working days per month policy in its calculation. Rather, the only justification Commerce gave regarding the reasonableness of its working days figure is that it is in accordance with its policy, which, as the court has explained, is insufficient. Therefore, substantial evidence does not support Commerce's decision to decline to use Plaintiff's data or its use of twenty-four working days per month in calculating the hourly labor value.

Here, it is apparent Commerce has relied on an unexplained policy unsupported by substantial evidence. *See CS Wind Viet. Co.*, 832 F.3d at 1377 ("[A]n agency's statement of what it 'normally' does or has done before is not, by itself, an explanation of 'why its methodology comports with the statute.'" (quoting *SKF USA Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001))).

Because Commerce has failed to support with substantial evidence its decision to decline to use Plaintiff's data, and its reasons for using its twenty-four working days per month, 5.5 working days per week, and eight working hours per day policy, the court finds that Commerce's determination of the surrogate value for the labor factor of production must be remanded.

## III.     Commerce's Determination of the Surrogate Glue Value is Supported by Substantial Evidence

Glue is used in the production process of the multilayered wood flooring to bind together the layers or plies of wood veneers with a core.[26] *See* PDM at 4 & n.19. To value the glue input,

---

[26]      Commerce stated in its PDM, "[m]ultilayered wood flooring is composed of an assembly of two or more layers or plies of wood veneer(s) in combination with a core. The several layers, along with the core, are glued or otherwise bonded together to form a final assembled product." PDM at 4.

"Commerce used Global Trade Atlas (GTA) data . . . for inputs classified according to Romania's harmonized tariff schedule ["HTS"] codes." Prelim. SV Mem. at 2. Commerce valued both mandatory respondents' glue input under Romanian HTS subheading number 3506.91.10 (covering "[a]dhesives based on polymers of headings 3901 to 3913 or on rubber: . . . [o]ptically clear free-film adhesives and optically clear curable liquid adhesives of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels"). *See* Final IDM at 15; Letter from Wiley Rein LLP to Sec'y of Commerce (Aug. 23, 2019) ("Pl.'s Initial SV Cmts.") Ex. 3, PR 330, CR 239. This subheading falls under the more general six-digit subheading, 3506.91, for "[a]dhesives based on polymers of headings 3901 to 3913 or on rubber," and includes "[o]ptically clear free-film adhesives and optically clear curable liquid adhesives of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels." Pl.'s Initial SV Cmts., Ex. 3. Commerce stated, by way of explanation, that subheading 3506.91.10 is more specific than other proposed subheadings:

> Jinlong reported HS number 3506.91[27] but did not describe the glue it used in the production of the subject merchandise, *while Guyu reported the more specific HS number 3506.91.10, corresponding with its description of the glue it used*. We preliminarily determined to use the more specific HS number for both companies based on the production processes reported by Guyu and Jinlong.

Final IDM at 15 (emphasis added). Commerce continued to use subheading 3506.91.10 for the Final Results. *See id.*

Plaintiff, on the other hand, argues that Commerce's selection of HTS 3506.91.10 is unsupported by substantial evidence because this subheading's language, which describes glue "used solely or principally for the manufacture of flat panel displays or touch-sensitive screen

---

27 HTS 3506.91 includes "[a]dhesives based on polymers of headings 3901 to 3913 or on rubber." Pl.'s Initial SV Cmts., Ex. 3.

panels" cannot include the same glue used to manufacture multilayered wood flooring.[28] *See* Pl.'s

Br. at 26-27 (emphasis omitted) (quoting Pl.'s Initial SV Cmts., Ex. 3). Plaintiff claims:

> [g]iven [the description of HTS 3506.91.10], there is no reason to believe that this
> is the same type of glue used in the manufacture of multilayered wood flooring. To
> the contrary, common sense would dictate that the manufacture of wood flooring
> *does not* use the same type of glue that is used *solely or principally* for the
> manufacture of flat panel displays or touch sensitive screen panels.

*Id.* at 26-27. Thus, Plaintiff's primary argument is that glue categorized under 3506.91.10 could

not actually have been used to make respondents' product. *See* Pl.'s Reply Br. at 10 (second

emphasis added) ("While HTS 3506.91.10 may be *a* more specific category, there is nothing on

the record supporting the conclusion that it is more specific to the input that was *actually used*.");

*see also* Pl.'s Br. at 26 (emphasis added) ("[Commerce] failed to acknowledge that that [sic]

neither Guyu nor Jinlong provided any information demonstrating that HTS 3506.91.10 *does*

*represent* the type of glue used to produce subject merchandise.").

Plaintiff's claims both misstate the record and misunderstand the HTS classification

system.

First, Commerce reasonably relied on the mandatory respondents' certified questionnaire

responses when reaching its decision. Guyu's response to Commerce's questionnaire identified its

input as "[o]verlaying glue; . . ."[29] and *it valued this glue under subheading 3506.91.10*

("[a]dhesives based on polymers of headings 3901 ["Polymers of ethylene, in primary forms"] to

3913 or on rubber: . . . [o]ptically clear free-film adhesives and optically clear curable liquid

---

28      While Plaintiff proposed two alternative subheadings at the administrative level,
here Plaintiff only argues that Commerce's selection of HTS subheading was not supported by
substantial evidence. *See* Pl.'s Br. at 24, 28; Pet'r's Case Br. at 9-10.

29      Guyu's additional description of the glue is confidential: "[[
       ]]." Guyu's Resp. Sec. C & D Quest. (July 10, 2019) Ex. D-1-1, PR 274, CR 169.

adhesives of a kind used solely or principally for the manufacture of flat panel displays or touch-sensitive screen panels"). Guyu SV Submission, Ex. SV-1, PR 317; Guyu's Resp. Sec. C & D Quest. (July 10, 2019) Ex. D-1-1, PR 274, CR 169 ("[o]verlaying glue; [[

]]); Pl.'s Initial SV Cmts., Ex. 3. Unlike Guyu's response, Jinlong's response provided no description of the glue and stated that it valued its glue under the less specific HTS subheading 3506.91. *See* Jinlong's Resp. Sec. C & D Quest. (July 16, 2019) Ex. D-6, PR 278, CR 185; *see also Dalian Meisen Woodworking Co. v. United States*, 46 CIT __, __, No. 20-00110, 2022 WL 1598896, at *10 (May 12, 2022) (not reported in Federal Supplement) ("There is nothing unreasonable about Commerce trusting the certified responses of the mandatory respondents as to the proper classification of the inputs they used to produce subject merchandise."). Thus, despite Plaintiff's arguments to the contrary, the record contains evidence that the glue actually used by one of the two mandatory respondents would be classified under subheading 3506.91.10.

Next, as to Plaintiff's claim that it would not be "common sense" to believe that glue whose "sole or *principal* use" was to bind sensitive screen panels was used to manufacture multilayered wood flooring. Commerce's preferred subheading (3506.91.10), however, is a principal use provision, not an actual use provision. That is, subheading 3506.91.10 includes the language "of a kind used solely or principally for." Pl.'s Initial SV Cmts., Ex. 3; *see BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1378, 1380 (Fed. Cir. 2011) (citations omitted) (concluding that a principal use analysis was appropriate where a Chapter Note required that the units in question be "of a kind solely or principally used in" a system). A principal use provision is "the use 'which exceeds any other *single* use.'" *Lenox Collections v. United States*, 20 CIT 194, 196 (1996) (not reported in Federal Supplement) (emphasis original). That a particular entry may be put to another actual use does not prevent that entry from being classified by its principal use. *See Clarendon Mktg., Inc. v.*

*United States*, 144 F.3d 1464, 1467 (Fed. Cir. 1998) ("[A] principal . . . use provision . . . may function as a controlling legal label, in the sense that even if a particular import is proven to be actually used inconsistently with its principal use, the import is nevertheless classified according to its principal use."); *see also BASF Corp. v. United States*, 30 CIT 227, 251, 427 F. Supp. 2d 1200, 1221 (2006) (citation omitted) ("[A]ctual use of an imported item is irrelevant to classification in a principal use provision."), *aff'd*, 497 F.3d 1309 (Fed. Cir. 2007). In fact, Guyu says that glue that would be classified under 3506.91.10 is just what it used to make its product. *See* Guyu's Resp. Sec. C & D Quest., Ex. D-1-1; Guyu SV Submission, Ex. SV-1. There is simply nothing on the record, common sense or otherwise that would indicate that glue classified under subheading 3506.91.10 could not, or would not, be used to make the mandatory respondents' product.

Because Commerce adequately supported and explained its subheading selection, substantial evidence supports Commerce's determination that HTS subheading 3506.91.10 is the best available information to value both mandatory respondents' glue input. Therefore, Commerce's selection of the surrogate HTS subheading to value the glue input is sustained.

## IV.   Commerce's Calculation of the All-Others Rate Lacks the Support of Substantial Evidence

Since Plaintiff's claim that Commerce must revise the all-others rate depends on whether Commerce's remand results produce a positive dumping margin for the mandatory respondents, the court defers consideration on this issue. *See* Pl.'s Br. at 28; *see also* 19 U.S.C. § 1673d(c)(5)(A).

## CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Final Results are sustained in part and remanded; it is further

**ORDERED** that, on remand, Commerce issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, Commerce must either put the whole amount of indirect production expenses from the Financial Statement in the numerator of the ratio for manufacturing overhead or explain why not. Should it choose to explain its conclusion not to include the whole amount of indirect production expenses, Commerce shall state why other categories of overhead normally placed in the numerator were not placed in the numerator here; it is further

**ORDERED** that, on remand, Commerce must reconsider the Labor Rate Policy's use in this case. If Commerce continues to use this policy, it must explain its source and the reason why it is reasonable to use it here, including how it would be more specific for use in Romania than the source provided by Plaintiff; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

                                                          /s/ Richard K. Eaton
                                                                  Judge

Dated:          May 5, 2023
                New York, New York