A-570-970
Remand
Court No. 20-3948
POR: 12/1/2017 – 11/30/2018
**Public Document**
E&C/OVIII:  AC

***American Manufacturers of Multilayered Wood Flooring v. United States*,**
**CIT Court No. 20-3948 (May 5, 2023)**
**Multilayered Wood Flooring from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the U.S. Court of International Trade's (CIT or the Court) remand

order in *American Manufacturers of Multilayered Wood Flooring v. United States*, Court No. 20-

3948, Slip Op. 23-70 (CIT May 5, 2023) (*Remand Order*).  The *Remand Order* concerns the

final results of the 2017-2018 administrative review of the antidumping duty (AD) order on

multilayered wood flooring (MLWF) from the People's Republic of China (China).[1]  In the

*Remand Order*, the Court directed Commerce to revise the surrogate manufacturing overhead

(MOH) ratio calculation by including the entire amount of indirect production expenses stated in

the surrogate financial statement in the numerator, or otherwise explain why it cannot do so.[2]

The Court held that Commerce's determination of the MOH ratio is not supported by substantial

evidence because:  (1) limiting overhead expenses in the numerator to depreciation, other

materials, and third party service expenses is unreasonable in light of the universe of expenses

normally considered to make up overhead; and (2) Commerce's claim that using the indirect

production expenses entry in the numerator of the MOH ratio may be distortive is a speculative

---

[1] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Review and Final Determination of No Shipments; 2017-2018*, 85 FR 78118 (December 3, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011).
[2] *See Remand Order* at 33.

conclusion.[3]

Additionally, the Court directed Commerce to reconsider the application of its Labor Rate Policy to calculate a surrogate hourly labor rate.[4]  Commerce's Labor Rate Policy assumes 24 working days per month, 5.5 working days per week, and eight working hours per day.  The Court held that Commerce failed to support with substantial evidence its decision to rely on the Labor Rate Policy assumptions instead of evidence proffered by plaintiff, the American Manufacturers of Multilayered Wood Flooring (AMMWF), which indicates that using 24 working days per month overstates the total number of working hours in a month in a number of other countries during much of the period of review.[5]  The Court further held that Commerce failed to identify a source or justification in the *Final Results* or in its published Labor Rate Policy for the numbers underpinning the labor rate policy.[6]  The Court directed Commerce to explain:  (1) the source for the assumptions; (2) why it is a reasonable basis on which to calculate the surrogate labor rate; and (3) how it is more specific to Romania than the source provided by AMMWF, the average annual hours actually worked per worker in Organization for Economic Cooperation and Development (OECD) countries.[7]

On July 6, 2023, we released the draft results of redetermination to interested parties, in which we revised the surrogate MOH ratio calculation and recalculated the hourly labor rate based on the Romania-specific information that AMMWF placed on the record of this remand redetermination.[8]  On July 13, 2023, we received timely comments from AMMWF and Jiangsu

---

[3] *See Final Results* IDM at 17-20; *see also Remand Order* at 19-20.
[4] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092, 36093 (June 21, 2011) (Labor Rate Policy); *see also Remand Order* at 33.
[5] *See Remand Order* at 26-28.
[6] *Id.* at 24-26.
[7] *Id.* at 33.
[8] *See* Draft Results of Remand Redetermination, *American Manufacturers of Multilayered Wood Flooring v. United States*, CIT Court No. 20-3948, dated July 6, 2023 (Draft Remand Redetermination).

Guyu International Trading Co., Ltd. (Jiangsu Guyu).[9]  Jiangsu Senmao Bamboo and Wood

Industry Co., Ltd. *et al.* (Senmao *et al.*) submitted comments incorporating the arguments of any

respondent parties, *e.g.*, Jiangsu Guyu.[10]

In Section III of these final results of redetermination, Commerce provides its analysis of

the comments submitted by AMMWF and Jiangsu Guyu on the draft results of  redetermination

included in Section II below.  In response to comments, as described in Section III below, we

revised the calculation of the hourly labor rate from the Draft Remand Redetermination.  Based

on these changes, we recalculated the margins of the following mandatory respondents:  Dalian

Qianqiu Wooden Product Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu

Wooden Product Co., Ltd., and Fusong Qianqiu Wooden Products Co., Ltd. (collectively,

Jinlong); and Jiangsu Guyu.  Additionally, we revised the separate rate for applicable non-

individually examined companies, as described below.

## II.    REMANDED ISSUES

### A.    Surrogate Manufacturing Overhead Ratio Calculation

#### 1. Background

In the *Preliminary Results*, Commerce relied on the financial statements of Romanian

producer SC Sigstrat SA (Sigstrat) for the fiscal year ending December 31, 2018, to value the

surrogate financial ratios,[11] including for the surrogate MOH ratio of 5.80 percent.[12]  In its case

brief for the *Final Results*, AMMWF argued that Commerce did not include certain expenses

---

[9] *See* AMMWF's Letter, "Comments on Draft Remand Determination" (AMMWF's Draft Remand Redetermination Comments); Jiangsu Guyu's Letter, "Comments on Draft Remand Redetermination" (Jiangsu Guyu's Draft Remand Redetermination Comments), both all dated July 13, 2023.

[10] *See* Senmao *et al.*'s Letter, "Comments on Draft Remand Redetermination," dated July 13, 2023.

[11] *See Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and New Shipper Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2017-2018*, 85 FR 6911 (February 6, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[12] *Id.*; *see also* Memoranda, "Surrogate Values for the Preliminary Results," dated January 31, 2020 (Preliminary SV Memorandum), at 7; "Preliminary Results Margin Calculation for the Fusong Jinlong Group," dated January 31, 2020, at Attachment VI; and "Preliminary Results Margin Calculation for Jiangsu Guyu International Trading Co., Ltd.," dated January 31, 2020, at Attachment VI.

indicated in Note 7 of Sigstrat's financial statements, in the surrogate financial ratios calculated for the *Preliminary Results*.[13]  Specifically, Note 7 reports that, of the 30,703,287 Romanian Lei (RON) cost of goods sold (COGS), 8,512,590 RON are for "Indirect production expenses," which AMMWF argued are overhead expenses.[14]  In its rebuttal brief, Jinlong argued that although AMMWF assumed that "indirect production expenses" are overhead expenses, indirect labor or energy expenses could reasonably be included in this category of expenses.[15]

In the *Final Results*, Commerce agreed with AMMWF that the ratio calculations should incorporate certain additional items listed in the notes to the financial statement with respect to COGS.[16]  For the surrogate MOH ratio, we subtracted line items from COGS that could be identified as overhead (*e.g.*, depreciation, other materials, third party expenses) and used the identified overhead expenses as the MOH numerator.  We then relied on the remaining COGS, adjusted for the change in finished goods, as the MOH denominator.  The notes to the financial statements also include a summary of COGS that shows it as comprised of two figures – basic activity expenses and indirect production expenses.  However, we did not use the indirect production expenses in our calculation because it was unclear what was included in indirect production expenses and whether the figure could include amounts, such as indirect labor, that should be part of the MOH denominator, which would overstate MOH.  For the *Final Results*, Commerce derived a surrogate MOH ratio of 12.68 percent.[17]

In the *Remand Order*, the CIT held that Commerce did not substantiate its concerns with double counting in relying solely on entries it could identify as overhead from the profit and loss account/income statement when constructing the numerator for the MOH ratio.[18]  Namely, the

---

[13] *See* AMMWF's Letter, "Case Brief," dated July 8, 2020 (AMMWF's Case Brief), at 3-5.
[14] *Id.* at 5.
[15] *See* Jinlong's Letter, "Rebuttal Brief," dated July 15, 2020 (Jinlong's Rebuttal Brief), at 1-2.
[16] *See Final Results* IDM at Comment 1.
[17] *Id.*
[18] *See Remand Order* at 16.

CIT held it was unreasonable for Commerce to not have found a way to include more items in its numerator of the ratio because overhead normally includes many more items like depreciation, other materials, and third party expenses, for example.[19]  In addition, the CIT held that Commerce's explanation for not using the indirect production expenses entry proposed by AMMWF because Commerce did not know the components of the overhead figure which may include indirect labor expenses was a "{s}peculatory conclusion" not supported by substantial evidence.[20]  Thus, the CIT remanded Commerce's determination of the MOH ratio.[21]

## 2. Analysis

As explained above, the CIT held that Commerce did not support its determination not to include the indirect production expenses from Sigstrat's financial statements in the numerator of the MOH ratio.[22]  In particular, the CIT held that overhead encompasses more than the items included by Commerce in the *Final Results* (depreciation, other materials, and third party expenses) and that Commerce's reason for relying on this understated overhead amount was speculative.[23]  Therefore, for the Draft Remand Redetermination, we recalculated the surrogate ratio for MOH to use the Sigstrat indirect production expenses figure, minus energy costs, as the numerator of the ratio and relied on the remaining portion of COGS, *i.e.*, the basic activity expenses plus the energy costs as the denominator.[24]

We concluded that energy costs are likely part of the indirect production figure and not the basic activity figure for two reasons.  First, the notes to the financial statements state that

---

[19] *Id.* at 17-18.
[20] *Id.* at 19-20.
[21] *Id.* at 20.
[22] *Id.* at 19.
[23] *Id.* at 18-20.
[24] *See* Memorandum, "Revised Surrogate Values for the Draft Remand Results," dated July 6, 2023 (Draft Remand Results SV Memorandum).  In calculating the denominator, we continued to adjust for the change in finished goods inventories.

products are valued at the cost of materials, workforce, and indirect production costs.[25]  Because COGS, *i.e.*, the cost of the products that are sold, is summarized as basic activity expenses and indirect production expenses,[26] we conclude that basic activity expenses, which are now the basis for our denominator, include only raw materials and direct labor.  Thus, all other production expenses are part of indirect production costs.  Second, the income statement shows company-wide costs by nature of expense (*e.g.*, raw material consumption costs, company-wide labor, company-wide energy, *etc.*), while the notes to the financial statements show expenses by function (*e.g.*, COGS, selling, general, and administrative expenses, *etc.*).[27]  In comparing these two views of company-wide expenses, we see that raw material costs (18 million RON) comprise the majority of the basic activity expenses (21 million RON), which leaves approximately three million RON in basic activity expenses.[28]  However, company-wide labor and energy costs are 12 and two million RON, respectively.[29]  Thus, based on these figures, we concluded that the basic activity expense, which is our MOH denominator, includes only raw materials and a portion of the company-wide labor expenses.  Therefore, because energy costs are part of the materials, labor, and energy denominator of the MOH ratio, we reclassified the energy costs included in Sigstrat's indirect production expenses and included them in the MOH ratio's denominator.  Commerce's methodology in this regard is consistent with the surrogate MOH calculation in *Wooden Cabinets from China*, in which we also used Sigstrat's financial statement.[30]

## B.  Labor Rate Policy

---

[25] *See* Jinlong's Letter, "Preliminary Surrogate Value Submission," dated August 23, 2023, at Exhibit SV-3 (Note 2 to the financial statements ("The cost of finished and in-process products includes materials, workforce, and related indirect production costs.")).

[26] *Id.* at Note 7 to the financial statements.

[27] *Id.* at the Profit and Loss Account Statement and Note 7 to the financial statements.

[28] *Id.*

[29] *Id.* at the Profit and Loss Account Statement.

[30] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 11953 (February 28, 2020) (*Wooden Cabinets from China*), and accompanying IDM at Comment 8.

1.  **Background**

In the *Preliminary Results*, Commerce calculated the hourly labor rate using

manufacturing-specific data from Chapter 16 of the National Institute of Statistics of Romania

(INSSE).[31]  We found this to be the best available information on the record to use as the

surrogate value for labor and calculated a manufacturing-specific labor rate of RON 9.23 per

hour.[32]  In its case brief, the AMMWF cited surrogate value data it placed on the record which

show that the average annual hours worked in numerous OECD countries totaled 1,734 during

2018, which is in the review period.[33]  AMMWF further stated that 24 working days per month

is greater than the number of days calculated by adding Monday through Friday working days in

any given month.[34]  In its rebuttal brief, Jinlong argued that:  (1) assuming that the OECD labor

data are correct (*i.e.*, 1,734 hours per year per worker), this indicates that a laborer works 18 days

per month, which is too low for a normal laborer; and (2) using labor data from the OECD would

include countries that are not on Commerce's list of economically comparable countries.[35]

In the *Final Results*, Commerce did not make any changes to the labor rate calculation.[36]

We explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that

data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working

days a week and 24 working days per month."[37]  Further, we stated that to use the OECD data

suggested by AMMWF would employ a methodology that is not specific to Romania and

that utilizes secondary sources that are unrelated to the source used to value labor.[38]

In the *Remand Order*, the CIT held that "the legal authority for establishing Commerce's

---

[31] *See Preliminary Results*; *see also* Preliminary SV Memorandum at 6.
[32] *Id.*
[33] *See* AMMWF's Case Brief at 7 (citing AMMWF's Letter, "Multilayered Wood Flooring from the People's Republic of China:  Initial Comments on Surrogate Values," dated August 23, 2019, at Exhibit 5C).
[34] *Id.* at 7-8.
[35] *See* Jinlong's Rebuttal Brief at 2-5.
[36] *See Final Results* IDM at Comment 2.
[37] *Id.* (citing Labor Rate Policy, 76 FR at 36094, footnote 11).
[38] *Id.*

{*Labor* Rate} policy is not at issue."[39]  However, the CIT held Commerce failed to identify a

source for the assumptions of using 24 working days per month, 5.5 working days per week, and

eight working hours per day in calculating the hourly labor surrogate value.  Therefore,

Commerce did not provide an adequate explanation to support its decision with substantial

evidence.[40]  Further, in light of the OECD data AMMWF offered to indicate the number of hours

worked for 2018 was fewer than the number resulting from Commerce's calculation, the CIT

held Commerce did not provide a reasonable explanation, supported by substantial evidence, in

rejecting AMMWF's proposed data.[41]

## 2.  Analysis

To comply with the Court's order that Commerce explain the source of its Labor Rate

Policy assumptions, on June 5, 2023, Commerce placed information from the International Labor

Organization (ILO) on the record.[42]  This information includes pages from the ILO website

which indicate that:  (1) Romania is a member of the ILO; and (2) workers in ILO member

nations work between 40 and 48 hours per week.[43]  To derive the assumption that there are 24

working days per month, we first averaged the ILO's provided figures of 40 and 48 hours to

calculate 44 working hours per week, which we then divided by eight hours a day to calculate

5.5 working days per week.  Next, we divided 52 weeks per year by 12 months per year to derive

approximately 4.33 weeks per month.  Finally, we multiplied 4.33 weeks per month by 5.5

working days per week to calculate approximately 24 working days per month.  We allowed

interested parties an opportunity to submit comments and factual information to rebut, clarify, or

correct the ILO information.

---

[39] *See Remand Order* at 24.
[40] *Id.* at 25.
[41] *Id.* at 26-27.
[42] *See* Memorandum, "Placing International Labor Organization information on the Record," dated June 5, 2023
(ILO Memorandum).
[43] *Id.*

On June 8, 2023, AMMWF submitted ILO labor information specific to Romania indicating that:  (1) in 2018, the average weekly hours actually worked in the manufacturing sector in Romania was 40.7; and (2) there were 34 days of paid time off (or paid leave) and holidays in Romania.[44]  In its submission, AMMWF argued that, in view of this evidence, it is unreasonable to assume that individuals in Romania work 24 days per month and eight hours per day (for a total of 2,304 hours per year) and requested that Commerce rely on AMMWF's newly-submitted information in this remand redetermination.[45]

For the Draft Remand Redetermination, we determined that the Romania-specific ILO information is the best available information for deriving an hourly labor value given its specificity to the primary surrogate country.  In contrast, the OECD information placed on the record by AMMWF in the administrative review is not specific to Romania because Romania is not an OECD member.[46]  However, we disagreed with AMMWF's proposed calculations using the Romanian ILO data.  In particular, AMMWF used the ILO value for average weekly hours actually worked per employed person in Romania (*i.e.*, 40.7 hours) and provided a calculation using that value to obtain average hours worked per month in Romania (*i.e.*, 153 hours).[47] AMMWF requested that Commerce use this calculation of hours worked per month in Romania to convert the monthly labor rate Commerce initially used for the calculation to an hourly rate, which results in a manufacturing-specific labor rate of 11.58 RON per hour.  However, we determined that AMMWF's calculation was incorrect for two reasons.

First, AMMWF deducted paid leave and public holidays that employees are entitled to in Romania (in the form of weeks per year) from the total number of weeks per year (*i.e.*, 52 weeks per year minus 34 paid leave and public holidays, divided by five working days per week).

---

[44] *See* AMMWF's Letter, "Response to International Labor Organization Information," dated June 8, 2023 (AMMWF's ILO Comments).
[45] *Id.* at 3.
[46] *See Remand Order* at 26, n.24.
[47] *See* AMMWF's ILO Comments at 4.

However, deducting paid leave and public holidays from the total weeks worked is not an accurate measurement of the hourly rate because the mean weekly hours actually worked in Romania provided by AMMWF (*i.e.*, 40.7 hours) has already been adjusted to remove the paid leave and public holidays.

Second, according to AMMWF, the correct way to calculate weeks actually worked per year using hours actually worked per week would be to multiply the value of hours actually worked per week (*i.e.*, 40.7 hours) by 52 weeks per year and divide that by 12 months per year. In the Draft Remand Redetermination we stated that this calculation would not result in an accurate calculation of the hourly rate because the monthly average net earnings in Romania takes paid leave and public holidays into account and the mean weekly hours actually worked does not.[48]

Therefore, for the Draft Remand Redetermination, we recalculated the hourly labor rate based on the Romania-specific information that AMMWF placed on the record, but we added the mean weekly hours actually worked in Romania provided by AMMWF (*i.e.*, 40.7 hours) and the total hours of paid leave and holiday hours per week (*i.e.*, 34 paid leave and public holidays multiplied by eight hours per work day, divided by 52 weeks per year equals 5.23 hours) to derive 45.93 total paid hours per worker per week in Romania.[49]  Using this value, we ultimately calculated a Romania-specific and manufacturing-specific labor rate of 8.90 RON per hour, which we noted closely approximates the labor rate of 9.23 RON per hour used in the *Final Results*.[50]  As explained below, we have revised this calculation for the final results of redetermination.  For these final results of redetermination, we are now calculating a Romania-

---

[48] Information from AMMWF's ILO Comments indicates that Romanian workers receive paid leave and holidays. *See* AMMWF's ILO Comments at Exhibit 2.  Therefore, we can infer that the net earnings calculated by INSSE take paid leave and holidays into account.  *See, e.g.*, *Preliminary Results*; Preliminary SV Memorandum at 6; and Draft Remand Results SV Memorandum.

[49] *See* Draft Remand Results SV Memorandum.

[50] *Id.*; *see also Preliminary Results*; Preliminary SV Memorandum at 6, unchanged in *Final Results*.

specific and manufacturing-specific labor rate of 10.05 RON per hour.

## III.  INTERESTED PARTY COMMENTS

*AMMWF's Arguments*[51]

1. Surrogate MOH Ratio

- In the *Final Results*, Commerce calculated MOH for Romanian company Sigstrat based on the sum of the line items for depreciation, other materials, and third-party services.[52]  In doing so, Commerce did not rely on the amount identified in the financial statement as "indirect production expenses" based on the concern that this amount "may" include indirect labor expense and thus could result in double counting.[53]  The CIT, however, rejected this reasoning, explaining that Commerce's concern of double counting was speculative and thus unsupported by the record.[54]
- In the Draft Remand Redetermination, Commerce recalculated the surrogate MOH ratio to include indirect production expenses (also identified as "production overhead")[55] as the starting point for its MOH calculation.[56]  However, instead of using the full value of identified MOH expenses to calculate Sigstrat's MOH expense, Commerce deducted the amount identified elsewhere in Sigstrat's financial statement for energy costs based on its determination that "energy costs are likely part of the indirect production figure."[57]
- Commerce's decision to deduct the amount identified for energy costs from the reported MOH expenses is unsupported by the record and should be reversed for the final remand redetermination.  There is nothing in Sigstrat's financial statement demonstrating that the amount identified for production MOH includes energy costs.  Thus, Commerce's determination with respect to energy costs suffers from the same flaw as it did in the *Final Results* with respect to indirect labor.
- The CIT explained that "speculatory conclusions are not supported by substantial evidence."[58]  As with its presumption that Sigstrat's MOH expenses included indirect labor, Commerce has presumed that MOH expenses include energy expenses without information in the financial statement demonstrating that this is true.
- Although Commerce recognized that Sigstrat's financial statement does not show that MOH expenses include energy costs, it stated only that it believes that it is "likely" that such costs may be covered.[59]  The CIT has recognized that Commerce may not make adjustments to the financial ratios to account for double counting based on speculation.[60]  Therefore, because Sigstrat's financial statement does not speak to this issue, Commerce should not presume that an adjustment is needed.

---

[51] *See* AMMWF's Draft Remand Redetermination Comments.
[52] *Id.* at 3 (citing *Remand Order*, Slip Op. 23-70 at 10).
[53] *Id.* (citing *Remand Order*, Slip Op. 23-70 at 10-12).
[54] *Id.* (citing *Remand Order*, Slip Op. 23-70 at 17-20)).
[55] *Id.* (citing AMMWF's Letter, "Initial Comments on Surrogate Values," dated August 23, 2019 (AMMWF's SV Comments), at Exhibit 10, Note 7 ("Analysis of operating result") and Note 4 ("Operating Results Analysis")).
[56] *Id.* (citing Draft Remand Results at 5; and Draft Remand Results SV Memorandum at Attachment I).
[57] *Id.*
[58] *Id.* at 4 (citing *Remand Order*, Slip Op. 23-70 at 19 (citing *OSI Pharms, LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019))).
[59] *Id.* (citing Draft Remand Results at 5).
[60] *Id.* (citing *Elkay Mfg. Co. v. United States*, 34 F. Supp. 3d 1369, 1379-82 (CIT 2014)).

- Additionally, the information Commerce relied on does not support its determination or render it non-speculative.[61] Commerce notes that Sigstrat's financial statement states that "{t}he cost of finished and in-process products includes materials, workforce, and related indirect production costs."[62] Although Commerce concludes that "basic activity expenses" must "include only raw materials and direct labor,"[63] the information relied upon by Commerce does not support its conclusion because the language identified regarding the COGS is included in the notes providing a "{s}ummary of significant accounting policies applied" regarding "Stock"; thus, this language does not speak to the manner in which Sigstrat identified costs associated with basic activity expenses versus indirect production expenses elsewhere.[64]
- Commerce also pointed to the fact that raw material costs account for the majority of the reported basic activity expenses and presumed that this means that basic activity expenses only include raw materials and labor,[65] which is speculation unsupported by the record. Although not explicitly stated, Commerce's conclusion appears to be based on the presumption that, if energy is part of basic activity expenses, then the amount remaining would not be sufficient to account for labor. There is no basis for this conclusion.
- The total amount reported for basic activity expenses is 22,190,697 RON, and the total amount reported for energy is 1,534,472 RON.[66] Thus, if raw materials and energy are accounted for, there are still 1,966,379 RON unaccounted for in basic activity expenses. There is nothing on the record to indicate that this is an insufficient amount to account for labor.
- Accordingly, because Sigstrat's financial statement does not expressly delineate what is covered by its MOH expenses and does not clearly show that energy expenses have been treated as part of MOH, Commerce should not deduct energy expenses from Sigstrat's MOH expense amount, and this would result in an MOH expense ratio that is not based on the record but instead based on speculation.
- For the final results of redetermination, Commerce should adjust the financial ratio calculation such that the full amount of overhead expenses is attributed to MOH.

   2. Surrogate Labor Rate

- In the *Final Results*, Commerce converted the labor rate data on the record to a per-hour cost based on an assumption of 24 working days per month, 5.5 working days per week, and 8 working hours per day.[67] In doing so, Commerce rejected information provided by AMMWF which demonstrated that the assumptions relied on by the agency were not supported by the record.[68] The CIT further found that Commerce did not identify the basis for its assumptions regarding working days and hours and failed to provide a reasoned basis for rejecting the information proposed by AMMWF.[69]
- In the Draft Remand Redetermination, Commerce properly departed from its prior practice of assuming 24 working days per month in light of the Court's opinion and the information on

---

[61] *Id.* at 5 (citing Draft Remand Results at 5).
[62] *Id.*
[63] *Id.*
[64] *Id.* (citing AMMWF's SV Comments at Exhibit 10B, Note 2).
[65] *Id.* (citing Draft Remand Results at 6).
[66] *Id.* (citing AMMWF's SV Comments at Exhibit 10B, Note 7).
[67] *Id.* at 6 (citing Draft Remand Results at 7).
[68] *Id.*
[69] *Id.*

the record of this proceeding.[70]  AMMWF also agrees with Commerce's reliance on the Romania-specific data placed on the record by AMMWF to determine the number of hours worked.[71]  However, to calculate the hourly surrogate labor value, Commerce made certain adjustments to the data which are incorrect, unsupported by the record, and must be corrected for the final remand redetermination.

- Based on the data regarding hours worked and the number of paid holidays and days off work in Romania, AMMWF provided a calculation to derive 153 hours worked per month in Romania.  This calculation properly accounts for the actual hours worked per week and the paid time off that employees in Romania are entitled to by law.

- Further, the resulting number of hours worked per year (*i.e.*, 1,840) is consistent with the hours worked per year reported for numerous OECD countries (ranging from 1,363 to 2,148).[72]  Although Romania is not an OECD member, these data are still probative of the reasonableness of AMMWF's calculation, and there is no other information on the record regarding the actual hours worked per year.

- First, Commerce stated that AMMWF improperly deducted paid leave and public holidays from the number of weeks worked per year, which is incorrect "because the mean weekly hours actually worked in Romania provided by AMMWF (*i.e.*, 40.7 hours) has already been adjusted to remove the paid leave and holidays."[73]  Commerce provides no explanation for this claim and points to nothing on the record to support it.

- The data AMMWF provided are titled "Mean weekly hours actually worked per employed person by sex and economic activity."[74]  There is no basis for concluding that this represents anything other than the number of hours actually worked in a week.  Commerce's conclusion is further undermined by information from the European Commission regarding Romania, which reports that "a full-time employment contract involves 8 working hours per day (40 hours / 5 days a week)."[75]  In other words, this information shows that, in general, employees work 40 hours per week, consistent with data reported hours actually worked per week.

- Second, Commerce determined that AMMWF's calculation was flawed because "the monthly average net earnings in Romania takes paid leave and public holidays into account and the mean weekly hours actually worked does not."[76]  Commerce then added the total hours of paid leave and holidays to the total number of hours worked.  However, paid time off does not equate to time worked and to include hours attributed to paid time off in determining the cost per labor hour is necessarily distortive.

- The surrogate labor rate should represent the cost to an employer per hour of work received.  To include both hours worked and hours not worked understates that cost because it discounts the fact that employers must pay employees for time for which they are not working (*i.e.*, paid time off).

- Treating paid time off as hours worked in calculating a labor cost per hour discounts the cost to employers of providing paid time off, *i.e.*, paying for time for which work is not received.  In order to account for the full cost of labor, which includes paying employees for hours that they are not working, the denominator in determining the cost per hour can only include hours actually worked.

---

[70] *Id.* at 6-7 (citing Draft Remand Results at 8-9).
[71] *Id.*
[72] *Id.* (citing AMMWF's SV Comments at Exhibit 5C).
[73] *Id.* at 8 (citing Draft Remand Results at 9-10).
[74] *Id.* (citing AMMWF's ILO Comments).
[75] *Id.* (citing AMMWF's ILO Comments at Exhibit 2).
[76] *Id.* (citing Draft Remand Results at 10).

- Commerce's calculation results in the idea that Romanian employees worked approximately 46 hours per week, 52 weeks per year.[77]  This is not supported by and is, in fact, in direct conflict with the information on the record.[78]  This has resulted in a distorted and understated surrogate labor rate.
- Accordingly, for the final results of redetermination, Commerce should rely on the hours worked calculation provided by AMMWF.

   3.  Calculation of the Separate Rate

- In the Draft Remand Redetermination, Commerce properly revised the dumping margin applied to the separate rate companies to reflect the changes to the rates assigned to the mandatory respondents.  For the final remand redetermination, Commerce should also adjust the margin for the separate rate companies to reflect any changes to the rates calculated for the mandatory respondents.

*Jiangsu Guyu's Arguments*[79]

- In the *Remand Order*, the Court instructed Commerce to revise the surrogate MOH ratio calculation and to reconsider the application of its Labor Rate Policy to calculate a surrogate hourly rate.  In compliance with the *Remand Order*, Commerce recalculated the AD margins for mandatory respondents Jinlong and Jiangsu Guyu.[80]  Commerce also revised the separate rate for non-individually examined companies.[81]
- Although Jiangsu Guyu disagrees with the new methodology pertaining to the calculation of surrogate hourly labor values and the surrogate MOH ratio, Jiangsu Guyu ultimately agrees with Commerce's continued assignment of zero percent AD margin to Jiangsu Guyu in the Draft Remand Redetermination.
- As stated in the *Final Results*, Jiangsu Guyu made no sales of the subject merchandise below normal value during the period of review, and Commerce correctly calculated a zero percent margin.[82]  This fact has not changed, and the changes in the Draft Remand Redetermination for the surrogate value calculations did not result in a new AD margin for Jiangsu Guyu.
- Accordingly, Jiangsu Guyu respectfully requests that Commerce uphold Jiangsu Guyu's rate in the final results of redetermination in a manner consistent with the *Final Results*, the Draft Remand Redetermination, and as supported by the record.

**Commerce's Position:**

   1.  Surrogate MOH Ratio

For these final results of redetermination, we determine that our revised surrogate MOH ratio

is reasonable and is not based on mere speculation.  In the notes to the financial statements,

---

[77] *Id.* at 9 (citing Draft Remand Results SV Memorandum at Attachment II).
[78] *Id.* (citing AMMWF's ILO Comments at Exhibit 2).
[79] *See* Jiangsu Guyu's Draft Remand Redetermination Comments.
[80] *Id.* at 3 (citing Draft Remand Results at 2-3).
[81] *Id.*
[82] *Id.* (citing *Final Results* IDM at 27).

Sigstrat shows COGS as being comprised of two components – basic activity expenses and indirect production expenses.[83]  However, the company's financial statements do not expressly identify what expenses are classified as basic activity expenses and what are indirect production expenses.[84]  Therefore, Commerce had to glean what information it could from the financial statements to make reasonable deductions about the components of these amounts.  We disagree that these conclusions are unsupported by the record.

    As noted above, we considered Sigstrat's explanation of how it values the products it produces and sells.  Sigstrat states that products are valued based on the cost of materials, workforce, and indirect production expenses.[85]  Thus, using a process of elimination, we consider this evidence that energy costs are part of indirect production expenses.  That is, energy costs are not materials or labor/workforce, therefore, they must be indirect production expenses when products are produced.  Because Sigstrat uses the same term "indirect production expenses" when defining the two components of the COGS, we concluded that energy costs were likewise part of indirect production expenses.  This is reasonable because COGS is comprised of the product costs (materials, workforce, and indirect production expenses) for the products that were sold during the period based on Sigstrat's financial statement[86] and it is also reasonable to conclude that Sigstrat would use the term indirect production expenses in a consistent manner within the same financial statements (*i.e.*, the expense would not have two different meanings in the same document).  Thus, we reasoned that because the indirect production expenses at note 2 include energy costs, the indirect production expenses at note 7 likewise include energy costs.  Further, for this reason we disagree with AMMWF's assertion that the notes providing a "{s}ummary of significant accounting policies applied" regarding

---

[83] *See* Jinlong SV Comments, at Exhibit SV-3, Note 7 to the financial statements.
[84] *Id.*
[85] *See* Jinlong SV Comments, at Exhibit SV-3, Note 2 to the financial statements.
[86] *Id.*

"stock" (*i.e.*, product that was sold) does not speak to the manner in which Sigstrat identified

costs associated with basic activity expenses versus indirect production expenses.[87]  As

discussed, because Sigstrat states that products are valued based on the cost of materials,

workforce, and indirect production expenses and energy costs are not materials or

labor/workforce, therefore, they must be indirect production expenses when products are

produced.

Additionally, while the petitioner argues that energy expenses could be part of Sigstrat's

reported basic activity expenses, in considering the figures in the financial statements, we find

that AMMWF'S assumptions do not add up.  To summarize what is available in the surrogate

financial statements, the Sigstrat financial statements show two different views of its company-

wide expenses:  (1) in the profit and loss statement, company-wide expenses are shown by the

nature of the expense (*i.e.*, total raw materials (18,689,846 RON), total labor (12,458,240 RON),

total energy (1,534,472 RON), depreciation (1,534,472 RON), and other operating (2,313,994

RON)); and (2) in the notes to the financial statements, expenses are shown by function (*i.e.*, cost

of goods sold (30,703,287 RON), distribution (109,792 RON), general administrative (4,383,473

RON), and other operating expenses (1,337,915 RON)).[88]  Both views of the company expenses

equal total expenses of 36,534,467 RON.  Finally, in the notes, COGS is further delineated

between basic activity expenses (22,190,697 RON) and indirect production expenses (8,512,590

RON).[89]

AMMWF argues that "if raw materials and energy are accounted for, there are still

1,966,379 RON unaccounted for in basic activity expenses" (*i.e.*, basic activity expenses of

22,190,697 RON minus raw materials expenses of 18,689,846 RON minus energy expenses of

---

[87] *See* AMMWF Draft Remand Redetermination Comments at 5 (citing AMMWF's SV Comments at Exhibit 10B, Note 2).
[88] *See* Jinlong SV Comments, at Exhibit SV-3, profit and loss statement and Note 7 to the financial statements.
[89] *Id.*

1,534,472 RON) and "{t}here is nothing on the record to indicate that this is an insufficient amount to account for labor." However, as we note above, the profit and loss statement identifies company-wide labor costs of 12,458,240 RON, thus, petitioner assumes with no record support that only 15 percent of total labor is production-related expense.[90] Further, under AMMWF's assumptions there are still 10,491,861 RON in labor costs remaining that are not included under basic activity expenses (*i.e.*, total labor of 12,458,240 RON less 1,966,379 RON), and therefore must either be included with the indirect production expenses of 8,512,590 RON or included with the distribution, general administration, and other operating expenses of 5,831,180 RON (*i.e.*, 109,792 RON plus 4,383,473 RON plus 1,337,915 RON). Yet, if we assume that Sigstrat's distribution, general administrative, and other operating expenses are completely comprised of labor costs, then the indirect production expenses must include 4,660,681 RON of labor costs (*i.e.*, 10,491,861 RON minus 5,831,180 RON). Hence, under AMMWF's assumptions, a large portion of the indirect production expenses must be comprised of labor costs that, if the exact amount were known, should be removed from the numerator of the MOH ratio. In other words, by only removing the comparatively smaller amount for energy expenses, Commerce's methodology is more conservative than the calculation that we would have applied had we followed the petitioner's own assumptions.

Based on the above, we continue to find that energy costs are included in indirect production expenses on Sigstrat's financial statements. Sigistrat defines its product costing as materials, workforce, and indirect production expenses. Because energy is not a material or labor expense, we find it a reasonable deduction that energy expenses are classified as indirect production expenses in Sigstrat's normal books and records. Moreover, a comparison of expenses by nature to expenses by function demonstrates that company-wide labor expenses are

---

[90] *See* Jinlong SV Comments, at Exhibit SV-3, profit and loss statement.

so significant that it is not reasonable to assume basic activity expenses include both energy costs and production labor.  In fact, unlike Commerce's deductions which rely on Sigstrat's definition of its product costs, there is nothing in the financial statements to suggest that energy costs are part of basic activity expenses, thus, classifying them as such would be merely speculative.

2. Surrogate Labor Rate

AMMWF alleges that we did not provide an explanation or point to evidence on the record for our determination that it is improper to deduct paid leave and public holidays from the number of weeks worked per year in calculating the hourly labor rate – noting that we stated in the Draft Remand Redetermination that "the mean weekly hours actually worked in Romania provided by AMMWF (*i.e.*, 40.7 hours) has already been adjusted to remove the paid leave and holidays."[91]  We disagree with this argument as the record supports our conclusion.  We maintain that deducting paid leave and public holidays from the total weeks worked, as suggested by AMMWF, is not an accurate measurement of the hourly rate because information on the record indicates that the 40.7 mean weekly hours actually worked in Romania excludes paid leave and public holidays.[92]  Because hours actually worked (40.7) account only for the time actually worked, and not for the total time actually compensated, subtracting the paid leave and public holidays (34 paid leave days and public holidays divided by 5 working days per week) from the total 52 weeks per year would result in a calculation that would effectively remove the paid leave and public holidays twice to result in a higher labor rate.

However, we agree with AMMWF that certain changes are warranted to our calculations in the Draft Remand Redetermination.  In particular, for these final results of redetermination in light of AMMWF's Draft Remand Redetermination Comments, we are revising the labor rate

---

[91] *See* AMMWF's Draft Remand Redetermination Comments at 8.
[92] *See* ILO Memorandum at Attachment III, Concepts and definitions ("Hours actually worked excludes time not worked during activities such as: (a) Annual leave, public holidays, sick leave, parental leave or maternity/paternity leave, other leave for personal or family reasons or civic duty…").

calculation to calculate a labor wage rate that reflects the cost to the employer per hour actually worked (*i.e.*, by not including hours for paid leave and public holidays that we included in the denominator in our calculation for the Draft Remand Redetermination).  For these final results of redetermination, we multiplied the 40.7 mean weekly hours actually worked in Romania by the total number of weeks per year (*i.e.*, 52 weeks).  We then divided that value by the total number of months per year (*i.e.*, 12 months) to arrive at 176.37 hours actually worked per month.  We then divided the average monthly net earnings in Romania for employees that manufacture wood products (*i.e.*, 1,772 RON/month) by 176.37 hours actually worked per month in Romania to calculate the cost to the employer for each hour of work (*i.e.*, 10.05 RON per hour).  This is the "fully loaded" cost that reflects the cost to the employer per hour of work and accounts for the paid time off and holidays that the employer is required to provide the employees in the numerator and thus, is an appropriate valuation of the surrogate hourly labor rate.  We note that this approach aligns with the ILO assumptions upon which Commerce's Labor Rate Policy is based that also calculate hourly earnings (which is inclusive of paid time off and holidays) multiplied by weekly hours actually worked.[93]

## IV.    FINAL RESULTS OF REDETERMINATION

        Pursuant to the *Remand Order*, Commerce:  (1) revised the surrogate MOH ratio; and (2) explained the assumptions underlying our Labor Rate Policy and, accordingly, revised the surrogate hourly labor rate.  In these final results of redetermination, Commerce has considered AMMWF's and Jiangsu Guyu *et al.*'s comments.  In light of our analysis, we have made certain changes to the Draft Remand Redetermination, as discussed in Section III, and revised the

---

[93] *See* ILO Memorandum at Attachment I, Article 2 (defining hours of work as "the time during which the persons employed are at the disposal of the employer; it does not include rest periods during which the persons employed are not at the disposal of the employer"); *see also id.* at Attachment III, page 2 (defining "earnings" as "gross remuneration in cash and in kind paid to employees, as a rule at regular intervals, for time worked or work done together with remuneration for time not worked, such as annual vacation, or other type of paid leave or holidays") and page 3 ("Hourly earnings are multiplied by actual weekly hours worked, if available, for each gender for monthly earnings and for both sexes for monthly minimum wages, and then multiplied by 4.33 weeks").

weighted-average dumping margins for Jinlong,[94] Jiangsu Guyu,[95] and the separate rate for non-individually-examined companies[96] for the period December 1, 2017, through November 30, 2018, as follows:

| Company | Final Results of Redetermination Dumping Margin |
|---|---|
| Dalian Qianqiu Wooden Product Co., Ltd.; Fusong Jinlong Wooden Group Co., Ltd.; Fusong Jinqiu Wooden Product Co., Ltd.; and Fusong Qianqiu Wooden Product Co., Ltd. (collectively, Jinlong) | 2.05 |
| Jiangsu Guyu International Trading Co., Ltd. | 0.00 |
| Non-Individually-Examined Companies | 2.05[97] |

Based on our determination in the final results of redetermination, and should the Court affirm the final results of redetermination, Commerce intends to publish a notice of amended final results in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

8/24/2023

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[94] *See* Memorandum, "Final Remand Results Calculation Memorandum for the Fusong Jinlong Group," dated concurrently with these final results of redetermination.

[95] *See* Memorandum, "Final Remand Results Calculation Memorandum for Jiangsu Guyu International Trading Co., Ltd.," dated concurrently with these final results of redetermination.

[96] *See* the appendix for a list of these companies.

[97] As the recalculated margin for Jinlong is the only margin that is not zero, *de minimis*, or determined entirely under section 776 of the Tariff Act of 1930, as amended (the Act), we assigned this margin to the non-individually-examined companies, consistent with the guidance provided in section 735(c)(5) of the Act.

**Appendix**

| Non-Individually Examined Under Review Receiving a Separate Rate |
|---|
| A&W (Shanghai) Woods Co., Ltd. |
| Anhui Longhua Bamboo Product Co., Ltd. |
| Benxi Wood Company |
| Dalian Dajen Wood Co., Ltd. |
| Dalian Deerfu Wooden Product Co., Ltd. |
| Dalian Jiahong Wood Industry Co., Ltd. |
| Dalian Kemian Wood Industry Co., Ltd. |
| Dalian Penghong Floor Products Co., Ltd. / Dalian Shumaike Floor Manufacturing Co., Ltd. |
| Dalian Shengyu Science And Technology Development Co., Ltd. |
| Dalian T-Boom Wood Products Co., Ltd. |
| Dongtai Fuan Universal Dynamics, LLC |
| Dunhua City Dexin Wood Industry Co., Ltd. |
| Dunhua City Hongyuan Wood Industry Co., Ltd. |
| Dunhua City Wanrong Wood Industry Co., Ltd. |
| Dun Hua Sen Tai Wood Co., Ltd. |
| Dunhua Shengda Wood Industry Co., Ltd. |
| Guangzhou Panyu Southern Star Co., Ltd. |
| HaiLin LinJing Wooden Products, Ltd. |
| Hangzhou Hanje Tec Company Limited |
| Hunchun Xingjia Wooden Flooring Inc. |
| Huzhou Chenghang Wood Co., Ltd |
| Huzhou Fulinmen Imp. & Exp. Co., Ltd. |
| Huzhou Sunergy World Trade Co., Ltd. |
| Jiangsu Keri Wood Co., Ltd. |
| Jiangsu Mingle Flooring Co., Ltd |
| Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. |
| Jiangsu Simba Flooring Co., Ltd. |
| Jiashan HuiJiaLe Decoration Material Co., Ltd. |
| Jiaxing Hengtong Wood Co., Ltd. |
| Jilin Xinyuan Wooden Industry Co., Ltd. |
| Karly Wood Product Limited |
| Kember Flooring, Inc. |
| Kemian Wood Industry (Kunshan) Co., Ltd. |
| Lauzon Distinctive Hardwood Flooring, Inc. |
| Linyi Youyou Wood Co., Ltd. |
| Metropolitan Hardwood Floors, Inc. |
| Mudanjiang Bosen Wood Industry Co., Ltd. |
| Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd. |
| Omni Arbor Solution Co., Ltd. |

| |
|---|
| Pinge Timber Manufacturing (Zhejiang) Co., Ltd. |
| Power Dekor Group Co., Ltd. |
| Scholar Home (Shanghai) New Material Co., Ltd. |
| Shenyang Haobainian Wooden Co., Ltd. |
| Sino-Maple (Jiangsu) Co., Ltd. |
| Suzhou Dongda Wood Co., Ltd. |
| Tongxiang Jisheng Import and Export Co., Ltd. |
| Xuzhou Shenghe Wood Co., Ltd. |
| Yekalon Industry Inc. |
| Yihua Lifestyle Technology Co., Ltd. (successor-in-interest to Guangdong Yihua Timber Industry Co., Ltd.) |
| Zhejiang Dadongwu Green Home Wood Co., Ltd. |
| Zhejiang Fuerjia Wooden Co., Ltd |
| Zhejiang Longsen Lumbering Co., Ltd. |
| Zhejiang Shiyou Timber Co., Ltd. |