## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al.*,<br><br>Defendant-Intervenors. | Court No. 20-03948 |

## ORDER

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety; and further

ORDERED that final judgment is entered in favor of the United States.

Dated:_____, 2023
        New York, NY                          _____
                                              RICHARD K. EATON, JUDGE

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

|  |  |  |
|---|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | Court No. 20-03948 |
| Defendant, | ) ) | |
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
RACHEL BOGDAN
Senior Attorney
Office of the Chief Counsel
For Trade Enforcement and Compliance
United States Department of Commerce
Washington, D.C.

Kelly M. Geddes
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-2867

October 10, 2023

Attorneys for Defendant

**TABLE OF CONTENTS**

I.  Background.................................................................................................................... 2

II.  Standard of Review ..................................................................................................... 4

III.  The Court Should Sustain Commerce's Remand Results....................................... 5

     A.  Calculation Of The Manufacturing Overhead Surrogate Financial Ratio................ 5

     B.  Calculation Of The Hourly Labor Rate ................................................................. 7

IV.  Conclusion ................................................................................................................. 9

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

|  |  |
|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) Court No. 20-03948 |
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al.*, | ) ) ) |
| Defendant-Intervenors. | ) ) |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

Pursuant to Rule 56.2(h) of the Rules of this Court, defendant, the United States, respectfully submits these comments in support of the final results of redetermination filed by the United States Department of Commerce pursuant to this Court's opinion and remand order, *American Manufacturers of Multilayered Wood Flooring v. United States*, 639 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) (*Remand Order*) ECF No. 81.  *See* Final Results of Redetermination Pursuant to Court Remand, August 24, 2023 (Remand Results), ECF No. 81, P.R.R. 15.[1]  These comments respond to the comments filed by plaintiff American Manufacturers of Multilayered Wood Flooring (AMMWF) and defendant-intervenor Jiangsu Guyu International Trading Co., Ltd. (Jiangsu Guyu).  *See* AMMWF Remand Comments (Sep. 25, 2023) (ECF No. 84); *see also*

---

[1]  Citations to public and confidential documents from the administrative record are identified as "P.R. __" and "C.R. __," respectively and documents from the administrative remand record identified as "P.R.R. __" and "C.R.R. __," respectively.

Jiangsu Guyu Remand Comments (Sep. 25, 2023) (ECF No. 83).  Neither party is challenging

Commerce's results, and the results should be sustained.  *See* Jiangsu Guyu Remand Comments

at 1; AMMWF Remand Comments at 1-2.

**I.     Background**

This litigation concerns Commerce's final results of the 2017-2018 administrative review

of the antidumping duty order covering multilayered wood flooring from the People's Republic

of China.  *See Multilayered Wood Flooring from the People's Republic of China*, 85 Fed. Reg.

78,118 (Dep't of Commerce Dec. 3, 2020) (final results of 2017-18 antidumping duty admin.

review and new shipper review).

Because China is a nonmarket economy country, Commerce uses data from a surrogate

country—in this case, Romania—to calculate the normal value of the subject merchandise.  *See*

PDM (P.R. 387) at 26-33; *see also* 19 U.S.C. § 1677(b)(c)(1).  As part of its calculation,

Commerce calculates a value for the various factors of production, such as labor and materials,

and another value for general expenses and profit.  *See* 19 U.S.C. § 1677(b)(c)(3) and (4); *see*

*also* 19 C.F.R. § 351.408(c). To add amounts for "general expenses and profit," Commerce

usually calculates separate values for selling, general and administrative expenses, manufacturing

overhead, and profit using ratios obtained from financial statements of one or more companies

that produce identical or comparable merchandise in the surrogate country.  *See, e.g.*, *Shanghai*

*Foreign Trade Enterprises Co., Ltd. v. U.S.*, 318 F. Supp.2d 1339, 1341 (Ct. Int'l Trade 2004).

The first issue relevant to this remand concerns Commerce's calculation of the general

expenses to use in the numerator of the financial ratio.  In the underlying review, Commerce

relied on a surrogate financial statement from Romanian producer SC Sigstrat SA (Sigstrat).  *See*

IDM (ECF 32-5) (P.R. 468) at 7-8.  The financial statement included a figure representing total

indirect production expenses, but Commerce did not use this figure to calculate the denominator

of the financial ratio because it was unclear what was included in the figure.  *See id.*  Instead,

Commerce calculated the general expenses by adding together particular items found in the

financial statement's profit and loss account, representing depreciation, other materials, and

third-party expenses.  *See id.*  The result was substantially smaller than the figure for indirect

production expenses provided in the financial statement.  *See id.*

In its remand order, the Court held that this method of calculating general expenses was

not supported by substantial evidence.  *Remand Order*, 639 F. Supp. 3d at 1239.  It explained

that limiting overhead expenses to depreciation, other materials, and third-party service expenses

is unreasonable in light of the universe of expenses normally considered to make up overhead.  It

further concluded that Commerce's concern that the indirect production expenses entry in the

financial ratio might distort the financial ratio was speculative.  *Id.* at 1229.  Accordingly, the

Court directed Commerce to revise the surrogate manufacturing overhead ratio calculation by

including the entire amount of indirect production expenses stated in the surrogate financial

statement in the numerator, or otherwise explain why it should not do so.  *See Remand Order*,

639 F. Supp. 3d at 1237.

The second issue for this remand concerned Commerce's method for converting monthly

labor rate data into a surrogate hourly labor rate, for valuing the surrogate value of labor.

Commerce relied on certain assumptions from its published labor rate policy.  *See Antidumping*

*Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of*

*Production: Labor*, 76 Fed. Reg. 36,092, 36, 093 (Dep't of Commerce Jun. 21, 2011) (Labor

Rate Policy).  In particular, Commerce assumed 24 working days per month, 8 working hours

per day, and 5.5 working days a week.  IDM at 13 (citing Labor Rate Policy, 76 Fed. Reg. at

36,094, footnote 11).

The Court held that Commerce's reliance on the Labor Rate Policy was not supported by

substantial evidence.  The Court explained that Commerce failed to identify a source or

justification for the numbers in the Labor Rate Policy, in particular the assumption of 24 working

days per month.  *Id.* at 1232.  The Court noted that record evidence submitted by AMMWF,

which included the average annual hours worked per worker in countries in the Organization for

Economic Cooperation and Development (OECD), suggested that 24 days per month was a

significant overstatement.  *Id.* at 1233.  Accordingly, the Court directed Commerce to reconsider

its reliance on the Labor Rate Policy.  *Id.* at 1237.  If Commerce continued to rely on the Labor

Rate Policy, the Court directed it to "explain its source and the reason why it is reasonable to use

it here, including how it would be more specific for use in Romania than the source provided by

{AMMWF}."  *Id.* at 1237.

On remand, Commerce reconsidered both issues as directed by the Court.  It elected to

use the figure for indirect production expenses provided in the surrogate financial statement,

though it modified the figure by subtracting energy expenses.  With respect to the hourly labor

rate, Commerce chose to rely on new information specific to Romania submitted by AMMWF

during the remand proceedings.  No party is challenging the remand results.  *See* Jiangsu Guyu

Remand Comments at 1; AMMWF Remand Comments at 1-2.

## II.    <u>Standard of Review</u>

In remand proceedings, the Court will sustain Commerce's determinations if they are "in

accordance with the remand order," and are "supported by substantial evidence, and are

otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d

1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence"

means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Accordingly, "the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

### III.     The Court Should Sustain Commerce's Remand Results

The Court should sustain Commerce's remand results because they comply with the

remand order and are supported by substantial evidence and otherwise in accordance with law.

Commerce reconsidered the manufacturing overhead ratio calculation to include the entire

amount of indirect production expenses stated in the surrogate financial statement, minus energy

expenses.  Commerce also reconsidered the surrogate labor rate.  It explained the source of the

assumptions in the Labor Rate Policy, considered the alternative data placed on the remand

record by AMMWF, and determined it was appropriate to use the data submitted by AMMWF

because they were more specific to labor in Romania.  *See* Remand Results at 3-10, 14-19.

#### A.     Calculation Of The Manufacturing Overhead Surrogate Financial Ratio

Commerce recalculated the surrogate financial ratio using the figure for indirect

production expenses recorded in Sigstrat's financial statements, minus energy costs, as the

numerator of the ratio.  *See* Remand Results at 5.  Commerce relied on the remaining portion of

Sigstrat's cost of goods sold, *i.e.*, the basic activity expenses plus the energy costs, as the

denominator.  *Id.*

This determination is supported by substantial evidence.  In the notes to the financial

statements, Sigstrat shows cost of goods sold as being comprised of two components: basic

activity expenses and indirect production expenses. *Id.* at 6, 15 (citing Sigstrat Financial Statements in Jinlong Surrogate's Value Submission, P.R. 318). However, the company's financial statements do not expressly identify what expenses are classified as basic activity expenses and what are indirect production expenses. *Id.* at 15. Therefore, Commerce reevaluated the financial statements and drew reasonable conclusions about the components of basic activity expenses and indirect production expenses. *Id.*

Commerce concluded that energy costs, which Commerce typically includes as a component of the factors of production, are included in indirect production expenses on Sigstrat's financial statement, rather than the basic activity figure, for two reasons. First, the notes to the financial statement state that products are valued using the cost of materials, workforce, and indirect production costs. *Id.* at 5 (citing Sigstrat Financial Statements in Jinlong Surrogate's Value Submission, P.R. 318) (Note 2 to the financial statements ("The cost of finished and in-process products includes materials, workforce, and related indirect production costs.")). Because cost of goods sold, *i.e.*, the cost of the products that are sold, is summarized as basic activity expenses and indirect production expenses, Commerce concluded that basic activity expenses include only raw materials and direct labor (*i.e.*, workforce). *Id.* Thus, all other production expenses are part of indirect production costs.

Second, the income statement shows company-wide costs by nature of expense (*e.g.*, raw material consumption costs, company-wide labor, company-wide energy, etc.), while the notes to the financial statements show expenses by function (*e.g.*, cost of goods sold, selling, general, and administrative expenses, etc.). *Id.* at 6 (citing Sigstrat Financial Statements in Jinlong Surrogate's Value Submission at the Profit and Loss Account Statement and Note 7 to the financial statements). In comparing these two views of company-wide expenses, Commerce

6

observed that raw material costs (18 million RON) comprise the majority of the basic activity

expenses (21 million RON), which leaves approximately three million RON in basic activity

expenses.  *Id.*  However, company-wide labor and energy costs are 12 million RON and 2

million RON, respectively.  *Id.*  Based on these figures, Commerce concluded that the basic

activity expenses include only raw materials and a portion of the company-wide labor expenses

but not energy.  *Id.*  Because the denominator of Commerce's manufacturing overhead ratio

includes materials, labor, and energy, Commerce reasonably reclassified the energy costs

included in Sigstrat's indirect production expenses and included them in the manufacturing

overhead ratio's denominator.  *Id.*

Accordingly, Commerce complied with the remand order by largely accepting Sigstrat's

value for indirect expenses.  To the extent that it modified that value by reclassifying the energy

costs, Commerce provided a thorough explanation of that decision, demonstrating why it was

supported by the evidence and otherwise in accordance with law.

B.       **Calculation Of The Hourly Labor Rate**

To comply with the Court's order that Commerce explain the source of its Labor Rate

Policy assumptions, on June 5, 2023, Commerce placed on the record information from the

International Labor Organization (ILO).  *See* Placing International Labor Organization

Information on the Record Memorandum (Jun. 5, 2023) (P.R.R. 1).  This information includes

pages from the ILO website which indicate that Romania is a member of the ILO, and that

workers in ILO member nations work between 40 and 48 hours per week.  *Id.*  Commerce further

explained how it used this data to derive the assumption of 24 working days per month.  Remand

Results at 8.  Commerce first averaged the ILO's provided figures of 40 and 48 hours to

calculate 44 working hours per week, which Commerce then divided by eight hours a day to

calculate 5.5 working days per week.  *Id.*  Next, Commerce divided 52 weeks per year by 12 months per year to derive approximately 4.33 weeks per month.  *Id.*  Finally, Commerce multiplied 4.33 weeks per month by 5.5 working days per week to calculate approximately 24 working days per month.  *Id.*

Commerce allowed interested parties an opportunity to submit comments and factual information to rebut, clarify, or correct the ILO information.  On June 8, 2023, AMMWF submitted ILO labor information specific to Romania indicating that: (1) in 2018, the average weekly hours actually worked in the manufacturing sector in Romania was 40.7; and (2) there were 34 days of paid time off (or paid leave) and holidays in Romania.  *See* AMMWF's Response to International Labor Organization Information (Jun, 8, 2023) (P.R.R. 2).  AMMWF requested that Commerce rely on AMMWF's newly submitted information in these remand results.  *See id.*

Commerce determined that the Romania-specific ILO information is the best information on the record for deriving an hourly labor value given its specificity to the primary surrogate country.  Remand Results at 9.  Relying on this Romania-specific information, Commerce calculated a revised labor wage rate to reflect the cost to the employer per hour actually worked. *See id.* at 19.  Namely, Commerce multiplied the 40.7 mean weekly hours actually worked in Romania by the total number of weeks per year (i.e., 52 weeks).  *See id.*  It then divided that value by the total number of months per year (i.e., 12 months) to arrive at 176.37 hours actually worked per month.  *Id.*  Then, Commerce divided the average monthly net earnings in Romania for employees that manufacture wood products (i.e., 1,772 RON/month) by 176.37 hours actually worked per month in Romania to calculate the cost to the employer for each hour of work (*i.e.*, 10.05 RON per hour).  *Id.*  This is the "fully loaded" cost that reflects the cost to the

employer per hour of work and accounts for the paid time off and holidays that the employer is

required to provide the employees in the numerator (*i.e.*, the 1,772 RON/month). *Id.* This

revised calculation is supported by substantial evidence and in accordance with law.

## IV.    **Conclusion**

No party opposes Commerce's Remand Results. Jiangsu Guyu "agrees with the

Department's Remand Results" and that the redetermination comports with the Court's remand

order. Jiangsu Guyu Remand Comments at 1. AMMWF asserts that Commerce's remand

results "still fail{} to fully capture the cost" of manufacturing overhead and labor, "resulting in

undervalued surrogate values and a distorted dumping margin." AMMWF Remand Comments

at 1. Nonetheless, AMMWF "is not further challenging Commerce's remand determination

here." *Id.* at 2. Thus, because Jiangsu Guyu and AMMWF do not challenge the remand results,

and because the remand results are consistent with the Court's remand order, supported by

substantial evidence, and in accordance with law as set forth above, we respectfully request that

the Court sustain Commerce's Remand Results.[2]

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

---

[2] Though AMMWF cites its comments on Commerce's draft remand results in stating that Commerce's final remand results do not fully capture the applicable costs in the surrogate financial ratio or labor rate, "{o}bjections to an agency's draft remand results do not, without further elaboration, constitute validly presented objections to the final remand results." *See SMA Surfaces SMA Surfaces Inc. v. United States,* Slip Op. 23-137, 2023 WL 6142127, *4 (Ct. Int'l Trade Sept. 20, 2023). Indeed, Commerce fully addressed these arguments in its final remand results and modified aspects of its analysis based on the comments that it received. Therefore, the Court should consider AMMWF to have waived any challenge to Commerce's remand results. *See id.* at *2, *3-4 (finding arguments waived where party merely incorporated by reference their draft remand comments).

PATRICIA M. MCCARTHY
Director

/s/Tara K. Hogan

TARA K. HOGAN
Assistant Director

OF COUNSEL:
RACHEL BOGDAN
Senior Attorney
Office of the Chief Counsel
For Trade Enforcement and Compliance
United States Department of Commerce
Washington, D.C.

/s/ Kelly M. Geddes
Kelly M. Geddes
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-2867

October 10, 2023

Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 3,007 words.


/s/ Kelly M. Geddes

October 10, 2023